Magee-Hale Park-O-Meter Company v. Commissioner. Gerald A. Hale and Faye W. Hale v. Commissioner.
Magee-Hale Park-O-Meter Co. v. Commissioner
Docket Nos. 43058, 44651, 45281.
United States Tax Court
T.C. Memo 1956-57; 1956 Tax Ct. Memo LEXIS 239; 15 T.C.M. (CCH) 254; T.C.M. (RIA) 56057; March 12, 1956
*239 Held: Amounts received by individual petitioner from corporation in which he was a principal shareholder were payments on the purchase price of patent rights, not royalties for the use of such rights or disguised dividends. Held, further, amounts paid were reasonable and therefore fully deductible by petitioner corporation under section 23(1)(1), I.R.C. of 1939. Roy C. Lytle, Esq., 824 Commerce Exchange Building, Oklahoma City, Okla., for the petitioners. E. G. Sievers, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax against petitioners: *240 Year Ended
Petitioner
Deficiency
7/31/47
Magee-Hale Park-O-Meter Co.
$26,953.19
7/31/48
Magee-Hale Park-O-Meter Co.
42,600.68
7/31/49
Magee-Hale Park-O-Meter Co.
73,170.93
12/31/49
Gerald A. Hale and Faye W. Hale
15,000.72
12/31/50
Gerald A. Hale and Faye W. Hale
26,604.03
The cases were consolidated for hearing. The question involved in the case of Gerald A. and Faye W. Hale is whether a transfer by Gerald A. Hale of patent rights in certain improvements in the operation of parking meters was a sale or licensing agreement, or whether the payments received by Hale were dividends. If there was a sale or licensing arrangement, the question arises in the cases of petitioner Magee-Hale whether the amounts it paid were reasonable and therefore fully deductible under section 23, Internal Revenue Code of 1939. Findings of Fact Magee-Hale Park-O-Meter Company (hereinafter sometimes referred to as Magee-Hale or petitioner) is a Delaware corporation organized on August 9, 1945 by Gerald A. Hale, Carl C. Magee, J. B. McGay and George Nicholson. Petitioner is in the business of distributing and installing parking meters. The meters are manufactured by *241 a company owned by McGay and Nicholson. It filed its Federal income tax returns for the fiscal years ending July 31, 1947, 1948 and 1949 with the then collector of internal revenue for the district of Oklahoma. Gerald A. and Faye W. Hale are husband and wife, residents of Oklahoma City, Oklahoma. Their joint income tax returns for the calendar years 1949 and 1950 were filed with the then collector of internal revenue for the district of Oklahoma. In 1935 Magee, Hale, McGay and Nicholson organized the Dual Parking Meter Company to engage in the manufacture, sale and installation of parking meters. Magee owned 50 per cent of the stock of Dual, and the remaining 50 per cent was held by numerous other persons with Hale, McGay and Nicholson owning minor shares. Magee was an Oklahoma City business man, Hale a professor of engineering at Oklahoma A. & M. College, and McGay and Nicholson owned a manufacturing plant in Tulsa, Oklahoma, producing time devices and coin-operated machines. There was no royalty arrangement with Dual on these meters. Dual was sued for patent infringement by Vehicular Parking, Ltd., a corporation engaged in the same business. Because of the suit Dual had difficulty *242 selling its meters and its shareholders sold their stock to Vehicular. Dual's patents were turned over to Vehicular. For several years thereafter Magee and Hale worked for Vehicular as employees and McGay and Nicholson built meters for Vehicular, but they had no interest in the company. In 1945 Magee, Hale, McGay and Nicholson organized the petitioner corporation under the name Magee-Hale Park-O-Meter Company. The stock of petitioner consisted of 2,500 shares of class A stock having a par value of $1 per share and entitling the holder thereof to six per cent cumulative dividends, or a dividend of six cents per share yearly; and 965 authorized shares of class B stock of a par value of $100 a share. The class B stock had a right to vote on a share-for-share basis with the class A stock. Two hundred shares of class B stock were issued for $20,000, 240 shares were issued for preorganization expenses, and 240 shares were issued for jigs, dies, parts and engineering expenses, making a total of 680 shares issued and outstanding. The shares issued for cash were issued in equal amounts to Hale, Magee, Bonnie McGay (J. B. McGay's wife), and Oma Nicholson (George E. Nicholson's wife). The 240 *243 shares issued for preorganization expenses were divided between Hale and Magee and the 240 shares issued for tools, dies, etc. were issued to the Macnick Company, the stock of which was owned by Nicholson and McGay and their wives. Subsequently Nicholson and McGay and their wives purchased the above 240 shares of class B stock owned by the Macnick Company, after which the class B was owned; Hale 170 shares, Magee 170 shares, Bonnie McGay 110 shares, McGay 60 shares, Oma Nicholson 110 shares and Nicholson 60 shares. The class A and class B stockholders of Magee-Hale, according to the company's records, were the following: Oct. 1, 1946
Oct. 7, 1947
Oct. 5, 1948
Oct. 4, 1949
Names
A
B
A
B
A
B
A
B
G. A. Hale
625
170
625
170
625
170
625
170
G. E. Nicholson
625
60
625
60
625
60
625
85
Oma Nicholson
110
110
110
85
J. B. McGay
625
60
625
60
625
60
625
60
Bonnie B. McGay
110
110
110
110
Carl Magee Estate
625
170
625
170
625
170
(Ted Magee)
Ted Magee
625
85
Gertrude Magee Grenko
85
2500
680
2500
680
2500
680
2500
680
No dividends *244 on either class of stock were paid during the four fiscal years in question, but in the fiscal year ending July 31, 1950, the arrears on the class A stock of 24 cents a share were paid and a dividend of $50 a share was paid on class B stock. In a letter of September 5, 1945 to Magee-Hale Park-O-Meter Company, Hale stated that with the help of Magee, McGay and Nicholson he had developed a new automatic parking meter, on which patents would be sought by him (Hale) prior to October 1, 1945 under the trade name of Park-O-Meter. He offered to assign to Magee-Hale an "exclusive license to use, manufacture, subcontract for the manufacture thereof, and to sell meters manufactured under said patent, or patents, both as to the present model or its successors, and any and all improvements thereon, until the last licensed patent has expired." Magee-Hale was to pay a royalty of $4 for each meter made and sold by it, the royalty to be due and payable as provided in a separate agreement. In the letter Hale stated his intention to assign to Magee, McGay and Nicholson an undivided one-fourth interest in the patent applications, the patents, and payments derived from the proposed exclusive license *245 with Magee-Hale. On September 5, 1945, Hale executed an exclusive license to Magee-Hale, the provisions of which were as follows: "EXCLUSIVE LICENSE "WHEREAS, Gerald A. Hale of Oklahoma City, Oklahoma, (together with other persons for whom he is acting as trustee), have devised and developed a new automatic parking meter, upon which patents will be sought in the name of Gerald A. Hale, and under the trade name of Park-O-Meter, and upon which applications for patents will be applied for to the Patent Office of the United States prior to October 1, 1945, and "WHEREAS, the Magee-Hale Park-O-Meter Company, a Delaware corporation, of Oklahoma City, Oklahoma, is desirous of obtaining a sole and exclusive license to the subject matter of such application for Letters Patent, and to all Letters Patent for the full term thereof, or any extension thereof which may be hereafter granted by the Patent Office, with the sole and exclusive right to use, manufacture, subcontract for the manufacture, and/or to vend in the United States and all foreign countries, said parking meter device, or devices, used, manufactured and/or vended under said application for Letters Patent, and all Letters *246 Patent hereafter issued pursuant thereto, and any extension thereof. "NOW THEREFORE, in consideration of Ten Dollars ($10.00), receipt of which is hereby acknowledged, and for a further consideration of a royalty of Four Dollars ($4.00) per meter as exclusive license fee upon every meter used, manufactured, vended or installed under authority of this exclusive license, Gerald A. Hale (for himself and as trustee for all other persons interested in such patents to be applied for) agrees to grant Magee-Hale Park-O-Meter Company, and by these presents does grant Magee-Hale Park-O-Meter Company, a sole and exclusive license to use, manufacture, sub contract for the manufacture, and vend all such devices used, manufactured and vended under patent applications as hereinabove mentioned, and all patents that may be granted to him or any extension thereof, during the life of said patents. "If, for any reason meters are removed before full payment of the purchase price by the city, then no royalty shall be due thereon. Royalty is due and payable only after the customer city has paid for meters in full. "When, and if, Letters Patent are granted on said device, Gerald A. Hale agrees, for *247 consideration herein set out, to give the Magee-Hale Park-O-Meter Company such additional license as may be required by the Company enumerating Letters Patent and claims therefor by number, same to be in a form acceptable to the United States Patent Office for filing. "Executed this 5th day of September, 1945." The above instrument was not signed by the licensee and was not filed in the Patent Office. On September 17, 1945, Hale executed an application for letters patent on his parking meter invention. The application was filed in the Patent Office on October 1, 1945, and letters patent were granted on January 13, 1953. There were already a considerable number of patents in the parking meter field, and many elements of the Park-O-Meter were common to all parking meters. Thirteen claims were covered by the patent granted to Hale and his associates. These related to improvements in the operation of the parking meter, such as (a) actuation of the tripping mechanism by the force of the operator's insertion of a coin in the meter, (b) operation by various combinations of coins or multiples of coins, (c) resetting the time indicator according to the value of the coin inserted, and *248 (d) a coin-display window to decrease the use of slugs. Exhibit 14, describing in full the patent claims granted, is incorporated herein by this reference. On September 17, 1945, Hale assigned to Magee, Nicholson and McGay an "undivided one-fourth (1/4) of the full and exclusive right in and to said invention, as described in the said above mentioned application * * *." This assignment was recorded in the United States Patent Office on October 1, 1945. Magee-Hale received in addition to rights to the parking meter case design and an "accumulative indexing mechanism," both of which were developed by Hale, and the trade name Park-O-Meter, which Hale had purchased for $1,000. The indexing mechanism works as follows: If a coin is inserted when a meter has some time remaining on it, the mechanism resets the time indicator to cumulate the parking time already on the meter and the time given for the particular coin denomination inserted. The rights to receive payments for the manufacture and sale of the Park-O-Meter by Magee-Hale were owned as follows: 9/5/45
7/31/46
7/31/47
7/31/48
7/31/49
G. A. Hale
1/4
1/4
1/4
1/4
1/4
G. E. Nicholson
1/4
1/4
0
0
0
J. B. McGay
1/4
1/4
0
0
0
Carl Magee
1/4
0
0
0
0
Estate of Carl Magee
1/4
0
0
0
Paul A. Nicholson Trust
1/4
1/4
1/4
Established 3/28/47
John Patrick McGay Trust
1/4
1/4
1/4
Established 3/28/47
Ted Magee
1/8
1/8
1/8
Gertrude Magee Grenko
1/8
1/8
1/8
*249 Petitioner made its Federal income tax returns on an income deferred payment basis. It reported as income the proceeds of its meter sales as the amounts payable under the sales contracts were received. On this basis, during the fiscal years 1946 through 1949, its sales and income were as follows: Earned
Net
Gross
Revenue
Net Parts
Meters
Meters
on Meter
Sales and
Years
Sold
Sold
Sales
Other Income
1946
9480
9,480
$ 45,777.24
$ 3,697.75
1947
49164
49,174
707,540.03
8,875.29
1948
59191
59,624
1,337,612.87
20,213.81
1949
49251
49,251
1,460,262.93
37,783.57
167,529
$3,551,193.07
$70,570.42
Expenses
Other than
Net Income
Gross
Taxes and
Before Taxes
Royalty
Years
Income
Royalties
and Royalties
Paid
1946
$ 49,474.99
$ 52,083.93
($ 2,608.94)
$ 3,868.00
1947
716,415.32
479,127.89
237,287.43
66,272.00
1948
1,357,826.68
959,115.79
398,710.89
112,256.00
1949
1,498,046.50
1,040,767.27
457,279.23
190,076.00
$3,621,763.49
$2,531,094.88
$1,090,668.61
$372,472.00
Federal
Net Income
and State
Years
Before Taxes
Taxes
Net Income
1946
($ 6,476.94)
($ 6,476.94) *
1947
171,015.43
$ 65,693.55
105,321.88 **
1948
286,454.89
113,150.80
173,304.09
1949
267,203.23
103,179.85
164,023.38
$718,196.61
$282,024.20
$436,172.41
*250 In its operation Park-O-Meter proved to be superior to other parking meters, and it outsold other meters in substantial numbers. Petitioner paid its officers the following compensation as "Officers Commissions," which were computed according to the number of meters sold: Taxable Year Ended
July 31, 1947
$61,274.79
Taxable Year Ended
July 31, 1948
87,729.89
Taxable Year Ended
July 31, 1949
97,272.34 These amounts were allowed by respondent as business expense deductions. Vehicular Parking, Ltd., a Delaware corporation, was a patent holding company formed in Washington, D.C. in 1937. It held 31 parking-meter patents. In the early 1940's the United States sued Vehicular in the Federal District Court in Delaware for violation of the Sherman Anti-Trust Act. The court required Vehicular to license its patents on a reasonable royalty basis to those who wanted them. In 1946 Vehicular offered petitioner a license under its patents at a royalty of four per cent of the sales price of each meter. Petitioner intervened in the anti-trust suit, asking *251 the court to determine a reasonable royalty. The Master appointed by the court made a tentative report suggesting a royalty of three per cent, or $1.80 a meter on a non-exclusive basis. Before the court acted the parties reached a settlement in which petitioner's stockholders purchased the stock of Vehicular for a net amount of $50,000. Subsequently Vehicular was liquidated and the latter's patents were transferred to its shareholders, who in turn sold them to petitioner. In the negotiations between petitioner and Vehicular for a license for the patents held by Vehicular, the latter sought a royalty of $4 a meter. In its brief filed with the Master appointed by the court petitioner in resisting the $4 royalty contended that the $4 it was paying its stockholders was "for something other than a bare license on a patent application." The brief contains the following statement: "It is true that Magee-Hale is paying its proprietors $4 for every meter it sells. It is not, true that this $4 is paid for the simple license under a patent or an application. The record is quite clear what this $4 is being paid for by Magee-Hale. Mr. Hale testified, Record Page 37, as follows: 'It was our *252 purpose in this instant endeavor to protect our efforts and we decided to do that by combining the interest and the patent on the mechanism and a patent on the design of the case, and on the trademark and on any improvements that might be developing, and hold that as the four individuals and give the meter company an exclusive license or contract wherein they would pay us $4 on each of the four parts to be $1 per meter in return for those various things.' "It would thus be apparent that Magee-Hale paid Messrs. Magee, Nicholson, McGay and Hale $4the per meter for something other than a bare license on a patent application. This is illustrated by the fact that McGay and Nicholson are receiving two of the $4 and yet they did not design the present Magee-Hale meter. They received this $2 because of their research and development on a different design of meter that was never utilized and for the contributions, such as the furnishing of special parts to Hale, consultation and future inventions. In addition to the development and the design work on the Magee-Hale Meter, the $4 included any future improvement of any kind at any time acquired; the use of a trademark 'Park-O-Meter', the right *253 to use an especially designed case for parking meter; the right to use especially designed coin box, and the right to use a separate and independent invention of escapement mechanism, or timer for the parking meter owned by McGay and Nicholson, as clearly set out in the Record, Page 32." In 1937 Vehicular granted to Parkrite Corporation, parties unrelated to this suit, a non-exclusive license to manufacture, use and sell parking meters and related devices for a royalty of four per cent of the net sales price to the user, but not in excess of $2 a meter. There were two patents and three applications involved. In 1940 Vehicular granted to Dual Parking Meter Company, parties unrelated to this suit, a non-exclusive license to make, use, sell, lease and install meters, devices and related accessories at a royalty of four per cent of the sale price but in no event less than $1.40 for a manually operated meter, or $1.80 for an automatically operated meter. The license involved nineteen patents and six applications. In 1950 petitioner entered into a written agreement giving David A. McCowan of Toronto, Canada, the exclusive right to manufacture, use and sell in Canada the parking meter *254 patented by petitioner, and to use the trade-mark Park-O-Meter. McCowan was to pay a royalty of $4 on each meter sold and delivered, the royalty being payable only after McCowan had been paid in full by the purchaser from him. In 1953 petitioner granted to Venner, Ltd. of England, the sole and exclusive right to manufacture and sell and the nonexclusive right to use throughout Great Britain and many other foreign countries parking meters made under petitioner's inventions, for which applications for patents were to be made in Great Britain. The agreement provided that Venner was to pay petitioner a royalty on receipts from the manufacture and sale of meters amounting to eight per cent of the net amount received from sales by Venner. At current rates of exchange the average royalty is about $4.75 a meter. Included in the rights transferred to the Canadian and British manufacturers were the patent rights acquired by Magee-Hale from Vehicular Parking, Ltd. The average selling price of the Park-O-Meter in the United States is $60. The selling price of the Park-O-Meter in Canada is $86; in Great Britain it is between $57 and $119. In May 1947, when petitioner had installed 39,000 *255 meters, Magee and Nicholson assigned their right to receive payments from petitioner for the manufacture, use and sale of Park-O-Meters to trusts for their sons. Each reported a value of $30,000 for his gift for Federal gift tax purposes. The Commissioner valued each at $120,000 and determined a deficiency. The cases were settled by the parties' agreement on a value of $60,000 for each gift. On the joint income tax returns of Hale and his wife for 1949 and 1950, the payments received by Hale were reported as gain from the sale of a capital asset. On its income tax returns in 1947, 1948 and 1949, Magee-Hale * and 1949, Magee-Hale deducted the total amount of the payments to its principal shareholders as a business expense. Opinion TIETJENS, Judge: The first contention that respondent makes in the cases of both the corporate and individual petitioners is that the amounts paid by petitioner Magee-Hale to its shareholders, Magee, Hale, McGay, and Nicholson in its fiscal years 1947, 1948, and 1949 were in substance dividends and not payments deductible under section 23, Internal Revenue Code of 1939. [1] The basis of his assertion is that petitioner Magee-Hale and the four individuals *256 with whom it made the agreement (Hale acted on his own behalf and for the three other principal shareholders) are in fact the same parties; that the arrangement for the payments was not an arm's length transaction, nor bona fide, but was entered into to avoid Federal income taxes; that therefore the whole transaction should be disregarded and the claimed business expense deductions based on royalties disallowed. The fact that petitioner in entering into the royalty arrangement was dealing with its own shareholders who owned most of its stock does not of itself condemn the transaction or mean *257 that it was a sham, as respondent contends. We can not disregard the independent personality of petitioner as a legally recognized entity separate from its shareholders simply because it has business dealings with its own controlling shareholders. We repeat what was said in Stearns Magnetic Mfg. Co. v. Commissioner, 208 Fed. (2d) 849 (C.A. 7, 1954) at page 852: "An agreement between a corporation and its sole stockholders is valid and enforcible, if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. This is recognized by the Bureau of Internal Revenue in official rulings, O.D. 440 C.B. June 1930, p. 215, by the Tax Court, Webb Press Co., Ltd., 3 B.T.A. 247, and by the courts of review. Commissioner of Internal Revenue v. Thomas Flexible Coupling Co., 3 Cir., 198 Fed. (2d) 350, A. & A. Tool & Supply Co. v. Comm. of Internal Revenue, 10 Cir., 182 Fed. (2d) 300; J. H. Robinson Truck Lines v. Comm. of Internal Revenue, 5 Cir., 183 Fed. (2d) 739. *258 * * *" Nevertheless, when we add to the element of control the circumstances that petitioner paid no dividends in the years in question and that the amounts paid as royalties were quite substantial in relation to petitioner's earnings, again a close examination of the royalty transaction is called for (cf. Differential Steel Car Co., 16 T.C. 413, 423-424 1951; for such circumstances strengthen the possibility that the parties entered into the transaction in a purely nominal or formal fashion just to realize tax advantages without any intention of being bound as parties dealing at arm's length. Of most important bearing on this question of the validity of the transaction is the reasonableness of its terms, particularly that relating to the amount of the payments. The "exclusive license" of September 5, 1945 provided that petitioner was to pay Hale and the other principal shareholders a royalty of $4 on each meter sold and paid for. In return Magee-Hale received an exclusive license to "use, manufacture, subcontract for the manufacture, and vend" all parking meters manufactured and sold under patents to be applied for by Hale. What petitioner actually received under *259 the "exclusive license" was the improvements developed by Hale to make the parking meter work more efficiently. Thirteen of his claims for improvements in the operation of existing parking meters were eventually covered by patents granted. Although not included in the "exclusive license" of September 5, 1945, Magee-Hale actually received in addition rights to the accumulative indexing mechanism, the parking-meter design developed and patented by Hale, and the trade name Park-O-Meter. The best proof that what petitioner received had considerable value is the later superior performance of Park-O-Meter and its widespread acceptance in the market in preference to other meters. One measure of the reasonableness of the royalty payments made by Magee-Hale is what the Canadian and British manufacturers were willing to pay for the exclusive rights to manufacture Park-O-Meters in their countries. McCowan, the Canadian manufacturer, paid $4 a meter, and Venner, Ltd., the British company, paid eight per cent of their net sales price, which amounted to more than $4 a meter. Using these transactions as a measure of reasonableness, the payments made by Magee-Hale to its controlling shareholders *260 were not out of line. Respondent argues, however, that these agreements are not comparable since they were entered into in 1950 and 1953, five and eight years after the transaction in question, at a time when the value of the Park-O-Meter had been proved by the great number of its sales. We disagree. It does not necessarily follow that to meet the test of reasonableness the royalties paid by Magee-Hale should have been less than those paid by the British and Canadian manufacturers. As petitioner points out, Hale and his associates had considerable experience in the parking meter business and were no doubt able to make a fair estimate of the success that Park-O-Meter would have. Thus it can be argued with equal validity that the amount of royalty paid by the British and Canadian manufacturers shows that Hale and his associates made an accurate estimate of the worth of their patent rights in the first place. Respondent points out that Magee-Hale transferred much more to the British and Canadian manufacturers than it received from Hale, since after its original agreement with Hale it acquired the patents owned by Vehicular Parking, Ltd., and these were included in its agreements with *261 the foreign manufacturers. He argues from this that the original royalties should have been much less than they were. Just what value the Vehicular patents had is a matter of dispute between the parties. Yet, assuming that the rights transferred by Magee-Hale were more valuable than those it received from Hale, the usefulness of the comparison is not destroyed; nor does this mean that the original royalty was unreasonable. To be "reasonable" the original royalty payments need not have been the same or in strict relationship with payments in comparable agreements. Reasonableness, in our view, implies some variance and an allowable latitude. So long as the payments in question are within a sufficiently close range of those in comparable arm's-length transactions they meet the broad test of reasonableness. For the above reasons we feel that Magee-Hale received good value for the royalties paid to its controlling shareholders, and therefore that there is no basis for upsetting the royalty agreement on the ground that it was a sham or was not made in good faith. Other grounds asserted by respondent for the invalidity of the royalty agreement are that the "exclusive license" of September 5, 1945 was *262 written in terms of a deed, was not signed on behalf of Magee-Hale and was therefore not enforceable against it; and that when the exclusive license was granted, there was no patent in existence and a patent application had not even been filed. We think these contentions have no merit at all. It is readily apparent from the "exclusive license" that the contract of the parties was not dependent on mutual promises. The terms of Hale's offer were clearly spelled out in the "exclusive license." Magee-Hale accepted these terms when it made use of the improvements developed by Hale, and it became obligated to pay the $4 royalty when it was paid in full by its customer. Cf. 1 Restatement Of Contracts, sec. 52. Hale fulfilled his promise contained in the "exclusive license" to apply for patents on his developments before March 1, 1945. The fact that the patent was not gtanted until after the taxable years in question does not affect the contractual obligations of the parties here. The next question, which is presented by the petition of Gerald A. and Faye W. Hale, is whether Hale's grant of an exclusive license to Magee-Hale Company to manufacture, use, and sell automatic parking meters *263 having the improvements developed by Hale was a licensing arrangement or was the sale of a capital asset. If it was a sale, the royalties received by Hale are taxable at capital gains rates. If a license, ordinary income rates are applicable. The answer to this question will determine whether petitioner Magee-Hale Company is entitled to business expense deductions under section 23(a)(1)(A) for royalties paid to its principal shareholders, or to depreciation deductions under section 23(1) based on the cost of the rights transferred by Hale. It is not disputed that these rights were a capital asset held for more than six months. Cf. Samuel E. Diescher, 36 B.T.A. 732 (1937); Edward C. Myers, 6 T.C. 258 (1946); so that our only concern is whether there was a sale or license. The principle laid down in the many cases treating with this question has been recently expressed as follows in Watson v. United States, 222 Fed. (2d) 689, 690 (C.A. 10, 1955). "It is a firmly accepted principle of law that if the patentee conveys by an instrument in writing the *264 exclusive right to make, use, and vend the invention throughout the United States, or an undivided part or share of that exclusive right, or the exclusive right under the patent within a specified area within the United States, the conveyance constitutes an assignment of the patent, complete or partial as the case may be; and that a transfer short of that is not an assignment but a license. Waterman v. Mackenzie, 138 U.S. 252, 11 S. Ct. 334, 34 L. Ed. 923; United States v. General Electric Co., 272 U.S. 476, 47 S. Ct. 192, 71 L. Ed. 632; Doherty Research Co. v. Vickers Petroleum Co., 10 Cir., 80 Fed. (2d) 809, certiorari denied, 299 U.S. 545, 57 S. Ct. 9, 81 L. Ed. 401; Broderick v. Neale, 10 Cir., 201 Fed. (2d) 621. * * *" [And see Edward C. Myers, supra; Vincent A. Marco, 25 T.C. (December 16, 1955)] The reasoning in support of this principle is that by the terms of a patent grant a patentee receives from the United States an exclusive right to make, use, and vend his particular invention in the United States, and if he transfers this right to another for the life of the patent, he has given *265 up his entire interest in the patented invention and retains none of the attributes of ownership. Cf. Kimble Glass Co., 9 T.C. 183 (1947). Therefore, although the agreement to transfer is called a license, it is effectively a sale. As applied here the foregoing principle clearly requires the conclusion that the agreement was for the sale of Hale's rights in the Park-O-Meter. The wording of the "exclusive license" granted Magee-Hale Company a "sole and exclusive license to use, manufacture, subcontract for the manufacture, and vend all such devices [parking meter developed by Hale]" in the United States. Thus Hale gave up his entire interest in the parking meter improvements he developed, and he is entitled to capital gains treatment on the proceeds of the sale. We have already found that the amounts paid by Magee-Hale for patent rights in the Park-O-Meter were reasonable; they represent, therefore, a reasonable allowance for the expansion of property used in business within the meaning of section 23(1)(1), Internal Revenue Code of 1939. Associated Patentees, Inc., 4 T.C. 979 (1945) (subsequent opinion on rehearing). To give effect to adjustments *266 that are dependent on the conclusions reached above, and to reflect the agreement of the parties on previously contested questions, Decisions will be entered under Rule 50. Footnotes
*. Includes $25.00 non-deductible contributions. ↩
**. Does not include net operating loss carryover of $6,451.94.↩
1. If the payments are not dividends, there are two possibilities for deductions under section 23: If Hale licensed the patent rights to Magee-Hale Company, the latter is entitled to a deduction for "payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." (Section 23 (a)(1)(A)). If the patent rights were sold, Magee-Hale is entitled to a reasonable allowance for exhaustion of property used in its business. (Section 23(1)(1)↩).