## APPEAL OF WEBB PRESS CO., LTD.

Docket Nos. 2404, 2724. Submitted August 17, 1925. Decided December 23, 1925.

1. Two-thirds of the net profits paid under a royalty agreement, *held* to be a proper deduction under the circumstances of this appeal.

2. A stockholder owning 494 out of 500 shares of stock of the taxpayer corporation left in the business for working capital for the years 1918 and 1919 the sums of $288,137.36 and $283,478.98, respectively. These sums represented the amounts due him as royalties but not withdrawn. *Held*, that said sums may not be included in invested capital.

3. The value of certain patterns, tracings, blue-prints, etc., disallowed as invested capital for lack of proof of value.

4. The income derived from a certain contract to install a cotton compress *held* to have accrued in the year 1920.

*E. W. R. Ewing, Esq.*, for the taxpayer.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

### Before MARQUETTE and MORRIS.

This is an appeal from the determination of deficiencies for the years 1918 and 1919 in the sums of $1,652.11 and $9,380.95, respectively. Separate appeals were filed for each year but, it appearing that similar issues were involved for each year, the appeals were consolidated. The controversy involves mainly the proper treatment of certain royalties paid for patents in respect to income and invested capital.

FINDINGS OF FACT.

1. The taxpayer is a domestic corporation, organized under the laws of Louisiana in 1896, with its principal place of business at Minden. Its capital stock was $50,000, divided into 500 shares of the par value of $100 each, 494 of which were, during the years in question, owned by one R. D. Webb. The taxpayer was engaged in the business of manufacturing and installing cotton compresses and the supplying of the necessary material and parts thereof. It manufactured its product under patents owned by R. D. Webb, for the use of which patents the taxpayer was to pay him two-thirds of the net profits of the business each year.

2. The pertinent events leading up to the royalty agreement were as follows: R. D. Webb and his brother, S. J. Webb, owned certain patents for devices for compressing cotton. In the year 1900 the taxpayer manufactured the compresses under certain royalty agreements with the Webbs. About the year 1902 there arose a dispute between the Webbs, the corporation, and certain stockholders as to the proper amount to be allowed as royalties. In 1904 a decision was rendered by the Supreme Court of Louisiana, in which the court fixed the amount of royalties to be received by the Webbs at two-thirds of the net profits of the corporation. *Crichton* v. *Webb Press Co., Ltd.*, 113 La. 167; 36 So. 926. Under the decision this arrangement was to be continued until changed by agreement or the withdrawal of the patents by the Webbs from the corporation. Soon after the decision above mentioned, the Webbs purchased the stock of the other stockholders and operated the business. S. J. Webb died in the year 1909 and R. D. Webb purchased his stock and also his interest in the patents. On August 8, 1911, the taxpayer corporation passed a resolution definitely fixing the amount of the royalties to be paid substantially as fixed by the decision above referred to. The resolution relating to the royalty agreement read as follows:

Whereas this Company has been manufacturing and selling compresses and compress machinery under certain patents owned by S. J. and Robt. D. Webb since the date of its organization, and whereas the rights and interests of said owners of the patents have been recognized by resolutions of the stockholders and the Board of Directors of this Company, and whereas by judgment of the Supreme Court of Louisiana some of the resolutions were construed as related to certain issues presented, and whereas other resolutions while not being construed yet it was indicated that a proper distribution would be that this Company should receive one-third of the net profits accruing from the manufacture and sale of compresses under patents, and whereas this Company had not formally acted upon this matter since the date of such judgment, while at all times recognizing the rights of the owners of the patents, and it now being desirable to harmonize all former resolutions passed by this Company relative to its rights under its manufacture and sale of

compresses and compress machinery under said patents for the past as well as for future, and whereas said Robt. D. Webb owns said patents, and whereas the said Robt. D. Webb now offers to fix the amount of royalty to be paid to him for the use of said patents at two-thirds of the net profits of the Company in the past as well as in the future, provided that it be especially agreed, understood and stipulated that the said Robt. D. Webb does not grant this Company the -use of his patents for any certain time, but that the rights granted may be terminated by him at any time at his will and pleasure; therefore be it resolved that the royalties for the use of said patents be and are hereby fixed at two-thirds of all the net profits of this Company, and that such royalties be maintained until such time as either the said Robt. D. Webb or this Company shall revoke same by written notice.

At the time of the passage of the above resolution the books of the taxpayer showed profits of approximately $525,000, consisting mostly of commercial paper received for the compresses sold. The share of R. D. Webb from the royalty agreement was approximately $350,000. R. D. Webb was also the principal stockholder, owning 494 shares out of the 500 shares. He did not withdraw his share of the royalties at that time, as it would have crippled the business, but left it to be used in the operation of the business. During each of the subsequent years he withdrew approximately two-thirds of the net profits as royalties, but, on January 1, 1918, there was still in the business $288,137.36 out of the original $350,000 he left in the business August 8, 1911. This sum was further reduced to $283,-487.98 by January 1, 1919. It is these amounts that the taxpayer claims as invested capital for the years 1918 and 1919, respectively, and which the Commissioner disallowed.

There was no written agreement nor any resolution of the taxpayer as to the status of the royalty money left in the business. There was an understanding that Webb would charge no interest and, in case of losses, would expect the losses to be paid prior to his claim. In subsequent years, 1920 and 1921, however, he drew from the company amounts in excess of the amounts due for current royalties until he owed the company approximately $18,000.

For the year 1918 the taxpayer deducted as royalties to R. D. Webb, representing two-thirds of the net income, the sum of $101,-042.21, and for the year 1919 it likewise deducted $182,812.79.

3. During the existence of the taxpayer it had accumulated various patterns, blue-prints and tracings for the manufacture and installation of its products. These had been worked upon and developed by R. D. Webb and S. J. Webb almost from the inception of the business. No separate account of the cost of these patterns and blue-prints was kept upon the books of the taxpayer. · They were used, however, during all this time and during the taxable years 1918 and 1919. In its income-tax return for 1918 and 1919 the taxpayer originally set up a value of $15,000 for these items,

all of which was disallowed by the Commissioner. In its amended petition herein the taxpayer alleged a value of $75,000, and at the hearing it presented an itemized account of these items totaling $86,834. This cost is not shown upon the books of the company, but the taxpayer attributes the value from an allocation of the amounts paid as salaries to the Webb brothers.

4. On June 28, 1919, the taxpayer entered into a contract with John W. Wright and H. F. Underwood to install a cotton compress at $32,000, to be paid for as follows:

$5,000 Cash to be deposited in the Royal National Bank of Palestine, Texas, to the credit of the party of the first part upon signing this contract, but made subject to its order upon arrival of the attachment in Jacksonville.

$5,000 During the erection of the attachment in Jacksonville, and by the time it is completed ready for work, to pay for freights, labor, material, etc., as the bills for same are presented.

$5,000 On the day the attachment is completed ready for operation on said premises in Jacksonville, Texas. Making $15,000 cash payments.

| $2,000 Jan. 1st, 1920 | $3,000 May 1st, 1920 |
| $3,000 Jan. 1st, 1921 | $3,000 May 1st, 1921 |
| $3,000 Jan. 1st, 1922 | $3,000 May 1st, 1922 |

The contract contained the following provision:

During the first thirty days after the erection of this attachment in Jacksonville ready for operation it is to be tested, and if found to meet the guarantee herein given it is to be at once accepted and the said six notes with the security securing same, are to be at once properly executed in accordance herewith by the parties of the second part and delivered to the party of the first part.

By the terms of the contract the balance of $17,000 was to be paid by notes, which were to be executed upon a test and acceptance by the purchasers. It was also provided that the contract could be assigned to the Jacksonville Compress Co., a corporation to be organized for the purpose of operating this compress. Through delay the test and final acceptance by the purchasers did not occur until January, 1920, and the notes were executed January 26, 1920. A deed of trust on the compress and the land it occupied was given to the taxpayer on the same date to secure the notes. The taxpayer made a profit of $3,814.99 on this transaction. The Commissioner allocated this income to the year 1919, while the taxpayer claimed it should have been included in the income of the year 1920.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 15 days' notice, in accordance with Rule 50.

### OPINION.

MORRIS: There are four questions involved in this appeal: (1) Whether or not the payments to Webb, as royalties in 1918 and 1919, were in fact a distribution of earnings and profits under the guise of royalties; (2) whether or not the sums of $288,137.36 and $283,487.98, the balance of royalties due Webb but retained in the business of the taxpayer, under the circumstances of this appeal, were invested capital for the years 1918 and 1919, respectively; (3) whether or not certain patterns and blue-prints had a value for invested capital purposes, and, if so, what was the value; and (4) whether or not the profit derived from the sale of a certain cotton compress, amounting to $3,814.99, was income for the year 1919 or the year 1920.

As to the first question, the Commissioner contends that the payments of royalties in 1918 and 1919 were in fact a distribution of earnings and profits under the guise of royalties. He bases this contention upon the facts that R. D. Webb, the recipient, owned 494 out of the 500 shares, and that the royalty payments were two-thirds of the net profits which the said Webb received in addition to a salary of $12,000 per year and the regular dividends of the corporation. It appears from the evidence, however, that the royalty agreement was regularly made in the year 1911. The amount of royalties is substantially the same as determined to be a reasonable amount by the Supreme Court of Louisiana at a time when there was friction between the stockholders and the corporation and when the holdings of the Webbs were much less than at this time. The profits of the corporation were directly attributable to the use of the patents. Even this large percentage of profits paid as royalties was a profitable arrangement to the taxpayer corporation, irrespective of the ownership of the stock. We are of the opinion that it was a *bona fide* arrangement and reasonable when considered in connection with the history and development of the business of the taxpayer.

We shall now consider whether or not the Commissioner erred in not allowing the said sums of $288,137.36 and $283,487.98 as invested capital for the years 1918 and 1919, respectively. It appears that in 1911 the taxpayer passed a resolution definitely fixing the royalty basis for the past as well as the future. It was fixed at two-thirds of the net profits each year. At that time the accumulated net profits were approximately $525,000, of which Webb's share was approximately $350,000. He did not withdraw this amount, but left it in the business as working capital. During subsequent years he withdrew as royalties two-thirds of the net profits for each year, encroaching somewhat upon the original $350,000 until, in the year

1918, the amount remaining was $288,137.36. He also withdrew two-thirds of the net profits in 1918 and, in addition, reduced the $288,-137.36 to $283,487.98 by January 1, 1919. It is these sums that the taxpayer contends were invested capital. There was no written agreement as to the status of this fund, but it seems to have been left there for the best interests of the company. Webb testified that he left it there as working capital and that he intended to charge no interest for the use of the money; neither did he intend it for an absolute gift. He stated that he meant to allow it to be subject to losses, if any, in preference to his own claims. Even after repeated questioning by counsel for the taxpayer, the members of the Board, and the counsel for the Commissioner, he was unable satisfactorily to define the exact status of this balance. It is our opinion, after a careful analysis of his testimony, that he in fact really intended to leave in the business as much of this fund as was necessary to advantageously run the company and to withdraw it gradually as the business justified. This view seems to be borne out by the actual facts. In 1911 the amount was $350,000, by 1918 it had been reduced to $288,137.36, and by 1919 to $283,487.98, and later, in 1921, it was all withdrawn. During all this time Webb in fact considered it his individual money, subject to withdrawal at times convenient to the taxpayer corporation.

The taxpayer's contention is based upon a misconception of the meaning of invested capital. While this fund may have been used as capital, nevertheless, it belonged to Webb and not to the corporation. It did not fall within the well-known classes of statutory invested capital. It was not cash or other assets paid in for stock; neither was it surplus or undivided profits.

Even were it a fact that the amount due Webb was subordinated to claims of general creditors and was a restricted indebtedness, this would not necessarily take it out of the class of borrowed capital, *Appeal of I. Unterberg & Co., Inc.*, 2 B. T. A. 274; nor would the fact that no interest was charged change the character of the fund to invested capital. *Appeal of Kelly-Buckley Co.*, 1 B. T. A. 1154. It is clear to our minds that these sums were not invested capital.

The taxpayer claims additional invested capital for certain patterns, blue-prints, tracings, etc. In support of this claim the taxpayer has presented a long detailed list of patterns upon which it placed a value of $86,834. In its amended petition it places the value at $75,000, and in its original returns for 1918 and 1919 it had placed the value at $15,000. The taxpayer seems to have kept no account of these patterns upon its books, nor had it capitalized them in prior returns. We are satisfied from the evidence that

these patterns did have a substantial value and could be capitalized for invested capital purposes were it possible to fix the value. The taxpayer has presented no books or other evidence to show how or in what way it arrived at the valuation submitted. It was vaguely stated that the values were an allocated portion of the salaries paid R. D. Webb and S. J. Webb, who had spent much time and labor upon them while in the employ of the taxpayer since 1896. However disposed we are to allow invested capital for those items, we are unable to do so from the data and evidence submitted.

The last issue involves the proper allocation of $3,814.99, income received from the sale of a certain compress to the Jacksonville Compress Co. The question is whether the income should be returned as of 1919 or 1920. The contract for the sale of the cotton compress reserved the title in the taxpayer, provided for substantial cash payments, and made provision for payments by notes after a test and acceptance by the purchaser. The contract in question was entered into June 28, 1919. The total purchase price was $32,000, of which $15,000 had been paid in various amounts in the year 1919. The contract provided for a test and acceptance within 30 days after the installation of the compress. It was installed in October, 1919, but, through some cause or other, the test and acceptance were delayed until January, 1920. On January 26, 1920, there was an acceptance, the purchaser executed notes for $17,000, the balance of the purchase price, and at the same time executed a trust on the land and compress to secure the notes. The Commissioner contends that the sale was consummated in 1919 and that the 1920 transactions involved only the payment of the money. The taxpayer claims that the sale was contingent upon the test and acceptance in January, 1920. This latter view, we think, should prevail under the circumstances of this case. Surely, the transaction was not completed until the cotton compress was tested and the acceptance made by the purchaser. This is borne out by the fact that the notes and securities for the balance of the purchase price were not executed until January 26, 1920. If the compress did not meet the test or was not accepted, this would clearly mean delay or a loss. At any rate, a profit could not be computed until the final acceptance. The income from this transaction, in our opinion, should be allocated to the year 1920. The test was a condition precedent and not a condition subsequent, the transaction was not a closed one until after January 1, 1920, and hence the income arising therefrom could not have accrued before that date.