Ringmaster, Inc. (Formerly Vevier Loose Leaf Company) v. Commissioner. Irving S. Federbush and Sylvia C. Federbush v. Commissioner.
Ringmaster, Inc. v. Commissioner
Docket Nos. 73984, 73985.
United States Tax Court
T.C. Memo 1962-187; 1962 Tax Ct. Memo LEXIS 124; 21 T.C.M. (CCH) 1024; T.C.M. (RIA) 62187; August 6, 1962
Burnett Schwartz, Esq., for the petitioners. Robert A. Roberts, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income tax of petitioners for the years and in the amounts as follows: Taxable
Docket No.
Petitioner
year ended
Deficiency
73984
Ringmaster, Inc. (formerly Vevier
11/30/52
$8,268.41
Loose Leaf Company)
11/30/53
8,463.69
73985
Irving S. Federbush and Sylvia C.
12/31/52
515.38
Federbush
12/31/53
3,921.11
At the trial, these cases were consolidated for trial and decision. *125 The issues presented for our decision are: (1) Whether legal fees in the amount of $2,000 and expenses in the amount of $51.69 incurred by Ringmaster, Inc., during the taxable year ended November 30, 1950, in connection with its reorganization are deductible; (2) Whether petitioner Ringmaster, Inc., incurred an allowable deduction for bad debts during the taxable year ended November 30, 1952, in the amount of $13,541.65; (3) Whether certain fees incurred by Ringmaster, Inc., during the taxable years ended November 30, 1951, November 30, 1952, and November 30, 1953, constitute interest within the meaning of sections 433(a)(1)(N) and 433(a)(1)(O) of the Internal Revenue Code of 1939; (4) Whether a deduction claimed by Ringmaster, Inc., for "brokerage fees" for the taxable year ended November 30, 1952, included $2,100 of expenses that was incurred and therefore accrued during a prior taxable year; (5) Whether the expenditures by Ringmaster, Inc., for "legal fees" during the taxable years ended November 30, 1952, and November 30, 1953, in the respective amounts of $2,000 and $6,000 are deductible; (6) Whether amounts claimed by petitioners Irving and Sylvia Federbush on their *126 joint return for the taxable year 1952 for legal expense in the amount of $1,400 constitute ordinary and necessary expense within the meaning of section 23(a) of the 1939 Code; (7) Whether Irving and Sylvia Federbush received income during the taxable year 1952 in the amount of $330.08 which they failed to report on their joint return for that year; and (8) Whether petitioner Sylvia Federbush realized constructive dividends during the taxable years 1952 and 1953 in the total amounts of $2,000 and $12,240.07, respectively, by reason of the redemption of her preferred stock at par value of $17,900 and the payment by Ringmaster, Inc., of certain legal fees on her behalf in the amount of $8,000. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner Ringmaster, Inc., was incorporated under the laws of the State of Missouri on December 10, 1946, as the Vevier Loose Leaf Company and operated under that name until June 3, 1955, when its name was changed to Ringmaster, Inc. During the years in issue Ringmaster, Inc., sometimes hereinafter referred to as Ringmaster or the corporation, was engaged in the manufacture and sale of loose-leaf *127 binders with its principal office located in St. Louis, Missouri. Ringmaster's income tax returns for the fiscal years ended November 30, 1950, 1951, 1952, and 1953, were filed with the director of internal revenue at St. Louis, Missouri. Ringmaster kept its books and filed its returns on an accrual method of accounting. Petitioners Irving S. and Sylvia C. Federbush are husband and wife residing in St. Louis, Missouri. They originally filed separate returns for 1952 and 1953 with the director at St. Louis, Missouri. On March 13, 1956, Irving S. and Sylvia C. Federbush, sometimes hereinafter individually referred to as Irving and Sylvia, filed a joint return for each of the years 1952 and 1953 with the director at St. Louis, Missouri. On September 30, 1949, Ringmaster filed a petition with the United States District Court for the Eastern District of Missouri for reorganization under Chapter X of the Bankruptcy. Act. On April 28, 1950, Ringmaster filed with the court a proposed plan of reorganization. By order entered August 16, 1954, the United States District Court confirmed Ringmaster's proposed plan of reorganization as amended by orders entered therein on June 12, 1950, and *128 July 20, 1950. This plan provided, in part, as follows: The Debtor, Vevier Loose Leaf Co., proposes the following Plan of Reorganization. This Plan is based upon a commitment of capital in the sum of $8,500.00, which sum is sufficient to provide Debtor with the necessary funds to make all cash payments designated in the Plan, together with a balance which, after confirmation of the Plan, may be used by the Debtor as additional working capital. * * * During the period April 28, 1950, to August 16, 1950, Ringmaster filed a report with the United States District Court entitled "Preliminary Report of Progress in Carrying Out Plan of Reorganization" which provided, in part, as follows: Treatment of Additional Capital The persons advancing funds to the debtor under the provisions of the Plan of Reorganization agreed to accept preferred stock of the Debtor in lieu of the promissory notes originally provided for in the Plan, thus subordinating their claims to all claims of creditors. Accordingly, and with the consent of the other preferred and common stockholders, 200 shares of such preferred stock were issued, at par, for the amount of such advances, aggregating $20,000.00, including *129 the $8,500.00 specifically provided for under paragraph I of the Plan. On September 15, 1950, the United States District Court entered its "Final Decree" in the matter involving the corporate reorganization of Ringmaster under Chapter X of the Bankruptcy Act. This decree provided, in part, as follows: IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED: 1. That the report of the Debtor respecting the acts done by it in connection with the consummation of the Plan of Reorganization be and the same hereby is in all respects approved. 2. That the Debtor be and it is hereby discharged of all its debts and liabilities, except as provided in the Plan of Reorganization and in the order of confirmation thereof entered August 16, 1950. 3. That the rights and interests of stockholders of the Debtor are hereby subjected to the Plan of Reorganization. 4. That all creditors of, claimants against, and stockholders of the Debtor, wheresoever situated or domiciled, are hereby restrained and enjoined from pursuing or attempting to pursue, and from commencing any suits or other proceedings at law, in equity or otherwise, against the Debtor or any assets or property of the Debtor, directly or *130 indirectly, on account of or based upon any right, claim or interest which such creditor, claimant or stockholder may have had in, to or against said Debtor, except only with respect to such liabilities and claims as the Debtor has expressly assumed or agreed to pay, pursuant to the terms and provisions of said Plan of Reorganization confirmed by order entered herein on August 16, 1950. As of August 21, 1950, the authorized capital stock of Ringmaster consisted of 500 shares of preferred stock, none of which was outstanding, and 20,000 shares of common stock, 8,500 shares of which were issued and outstanding and were registered in the names of Elwyn C. and Hortense J. Vevier. On August 22, 1950, 8,500 shares of the common stock of Ringmaster, represented by stock certificates numbered 36 through 44, were issued to Sylvia in substitution for the 8,500 shares of common stock, represented by stock certificates numbered 1 through 35, heretofore issued to Elwyn and Hortense Vevier. Ringmaster also issued on August 22, 1950, 200 shares of its preferred stock to Sylvia. The above-mentioned 200 shares of preferred stock were issued to Sylvia Federbush at par value of $100 per share in *131 consideration of advances by her to Ringmaster in the amount of $20,000. Throughout each of the years here involved, Sylvia owned all of the outstanding stock of Ringmaster and was in complete control thereof. She also had complete control of petitioner's books and records at all times here material. Issue 1. Legal Fees (Reorganization). Findings of Fact The law firm of Fordyce, Mayne, Williams and Hartman represented Ringmaster before the United States District Court in connection with its corporate reorganization under Chapter X of the Bankruptcy Act. On August 16, 1950, and September 15, 1950, the District Court granted the abovenamed law firm legal fees totaling $2,000 and related expenses in the amount of $51.69 for services rendered Ringmaster in connection with its reorganization. The above-mentioned legal fees and attendant expenses in the aggregate principal amount of $2,051.69 were deducted by Ringmaster on its income tax return for the taxable year ended November 30, 1950. The respondent disallowed in full the deduction for legal fees and expenses claimed by petitioners in the amount of $2,051.69 on its return for the year ended November 30, 1950. Opinion
*132 Petitioner Ringmaster, Inc., contends that the deduction claimed by it for legal fees and legal expenses on its return for its fiscal year ended November 30, 1950, and carried forward to its fiscal year ended November 30, 1952, as part of its net operating loss, constitutes ordinary and necessary business expenses and is properly deductible under section 23(a) of the 1939 Code. The respondent has taken the position that the legal fees and expenses incurred by petitioner during 1950 in the amount of $2,051.69 do not represent ordinary and necessary expenses of its business during 1950 and are not deductible. The amount in question represented legal fees to the extent of $2,000 and legal expenses of $51.69 incurred by Ringmaster during the taxable year ended November 30, 1950, for services rendered in connection with its reorganization under Chapter X of the Bankruptcy Act. It is well established that legal fees and expenses paid or incurred in connection with a corporate reorganization are in the nature of capital expenditures and are not deductible as ordinary and necessary business *133 expenses. Missouri-Kansas Pipe Line Co. v. Commissioner, 148 F. 2d 460, affirming a Memorandum Opinion of this Court; Skenandoa Rayon Corp. v. Commissioner, 122 F. 2d 268, affirming 42 B.T.A. 1287, certiorari denied 314 U.S. 696; Richard H. Survaunt, 5 T.C. 665, affd. 162 F. 2d 753. Further, legal fees paid in connection with a reorganization under Chapter X of the Bankruptcy Act are capital in nature and nondeductible. International Bldg. Co. v. United States, 199 F. 2d 12, reversed on other grounds, 345 U.S. 502, as also are legal and accounting fees paid in connection with a reorganization under section 77- B of the Bankruptcy Act. Bush Terminal Buildings Co., 7 T.C. 793. Throughout 1950, Ringmaster was engaged in the business of manufacturing and selling loose-leaf binders. The cost of a corporate reorganization under the Bankruptcy Act could scarcely be held to be a normal incident of a manufacturing or sales enterprise. An expense is "ordinary and necessary" within *134 the meaning of the statute when it is required in the ordinary course of conducting the operations of the business involved. Motion Picture Capital Corp. v. Commissioner, 80 F. 2d 872, affirming 32 B.T.A. 339. For the above-stated reasons, and in view of the decision of the Court of Appeals in International Bldg. Co. v. United States, supra, which we regard as controlling, we hold that the legal fees and expenses here in question are capital in nature and are not deductible by petitioner. Issue 2. Bad Debts. Findings of Fact On September 22, 1950, the United States Government and Ringmaster entered into a contract (Contract No. AF 49(147)-79) under which Ringmaster was to deliver 9,000 multi-ring binders of specified construction at a total price of $9,900 to the Transportation Officer, Andrews AirForce Base, Washington 25, D.C. This contract provided, in part, as follows: 5. INSPECTION. (a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall *135 be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance. * * *
11. DEFAULT. (a) The Government may, subject to the provisions of paragraph (b) below by written Notice of Default to the contractor terminate the whole or any part of this contract. * * * The Government did not inspect the binders during the course of production. On February 12, 1951, Robert W. Logan, A. F. Contracting Officer, Wright-Patterson Air Force Base, Dayton, Ohio, made certain findings of fact relative to the aforesaid contract which were incorporated in a document entitled "Findings of Fact and Notice of Default Termination, Contract No. AF 49(147)-79, Docket No. 75200," and which provided, in part, as follows: 11. On 7 December 1950, the Contractor delivered to the Government for inspection and acceptance a quantity of 3000 each Binders (Far East No. 9). 12. On 8 and 12 December 1950, these items were inspected by the Contracting Officer in the presence of the Contractor's representative. As a result thereof, the Contracting Officer rejected these items inasmuch as *136 they were not acceptable to the Government due to the following discrepancies: a. Rings do not open to required width; b. Improper arching of rings; c. Mechanism not securely riveted to backbone of cover; d. Backbone reinforcement not securely cemented on inside backbone; e. Decoration - Color stripes spotted. 13. Due to the failure of the Contractor to deliver acceptable articles * * * the rights of the Contractor to further proceed under the contract were terminated in accordance with the provisions of Article 5 and 11 thereof. * * * On December 19, 1950, petitioner was formally notified by telegram of the termination of the contract. On March 9, 1951, Ringmaster filed an appeal with the Armed Services Board of Contract Appeals, Washington, D.C., relative to the propriety of the contracting officer's action in terminating the aforesaid contract and assessing excess costs thereunder. The Armed Services Board of Contract Appeals denied Ringmaster's appeal on September 28, 1951. During the taxable year ended November 30, 1951, the United States Government asserted claims of damage against Ringmaster arising out of the company's default on Contract No. AF 49(147)-79 *137 and nonperformance of an order to the New York Quartermaster Procurement Agency. These claims of damages were asserted during the taxable year ended November 30, 1951, as an offset against an amount in the sum of $5,043.05 due Ringmaster from the Fort Jay Purchasing Branch, Post Supply Division, the Mallory Air Force Specialized Depot, and the New York Quartermaster Procurement Agency, all of which are United States Government agencies. Petitioner made the following entries on its accounts reflecting the delivery of the ring binders to the Government: Date
Dr.
11/27/50
$ 396.00
11/28/50
1,584.00
11/29/50
1,335.40
11/30/50
2,203.30
Total
5,518.70
12/ 2/50
1,102.20
12/ 7/50
1,877.70
Total
2,979.90
On its income tax returns for its fiscal years ended November 30, 1950 and 1951, petitioner respectively reported the above totals as income. On its income tax return for the fiscal year ended November 30, 1952, petitioner deducted $13,541.65 as a "bad debt" loss. Of the $13,541.65 deducted by Ringmaster on its return for that year, $5,043.05 consisted of penalties or claims for damages asserted by the United States Government during the petitioner's fiscal *138 year ended November 30, 1951, as the result of its default on Contract AF 49(147)-79 and its nonperformance of an order of the New York Quartermaster Procurement Agency. The remainder of the deduction claimed on its return for the fiscal year ended November 30, 1952, or $8,498.60, represents an amount which it claims it sustained as a loss during that year as the result of the termination of the above-described Government contract. The respondent disallowed in full the "bad debt" loss deducted by petitioner on its return for 1952. The respondent further determined that the $5,043.05 representing damage claims asserted against the petitioner by the Government during 1951 is properly deductible by it for its fiscal year ended November 30, 1951. Opinion Petitioner contends that it realized and properly accrued deductible losses in the amount of $13,541.65 during the fiscal year ended November 30, 1952, as the result of the rejection of merchandise which it claims it sold to the United States Government in late November or early December of 1950. Of the $13,541.65 deducted by Ringmaster on its return for the fiscal year ended November 30, 1952, $5,043.05 consisted of penalties or *139 claims for damages asserted by the United States Government during the corporation's fiscal year ended November 30, 1951, as a result of petitioner's default on Contract No. AF 49(147)-79 and nonperformance of an order to the New York Quartermaster Procurement Agency. The balance of the claimed deduction, or $8,498.60, represents the amounts petitioner entered on its books as accrued income which it claims it realized from the delivery and purported sale of a shipment of its ring binders to a prospective purchaser (United States Government) during December 1950 and which it contends it later sustained as a loss during its fiscal year ended November 30, 1952, as the result of the Government's refusal to accept its merchandise. The respondent has taken the position that the amount ($5,043.05) representing penalties or damage claims asserted against Ringmaster by the United States Government during 1951, which was paid by way of offsets during that year, is properly deductible for petitioner's fiscal year ended November 30, 1951, rather than its fiscal year ended November 30, 1952, as claimed by it. The respondent further contends that the $8,498.60 deducted by petitioner as a loss *140 for its fiscal year ended November 30, 1952, is not allowable because no such loss was realized by it either in 1952 or prior thereto. First, as to the $5,043.05 asserted against Ringmaster during its fiscal year ended November 30, 1951, by the United States Government as penalties or damage claims, it has been stipulated by the parties that such claims were asserted during that fiscal year, and that these claims were completely satisfied in that year by way of offsets against amounts due petitioner from agencies of the United States. Further, petitioner has failed to establish that it continued to contest its liability for these claims beyond November 30, 1951, or that it in fact could have appealed the penalties or claims asserted against it. We therefore are of the opinion that the $5,043.05 amount asserted against Ringmaster in claims or penalties properly was accruable as a loss or an expense for the taxable year ended November 30, 1951, and was deductible on its return for that year as respondent has determined rather than for the following year. See United States v. Consolidated Edison Co. of N. Y., 366 U.S. 380 (1961), affirming 279 F.2d 152. *141 With respect to the $8,498.60 claimed by petitioner as a deductible loss for the taxable year ended November 30, 1952, it is obvious that if there was not a completed sale of its merchandise to the United States Government, it could not later deduct this amount as the result of the subsequent rejection of its shipment of that merchandise because it would be deducting as its loss an amount it had never realized as income. John L. Seymour, 14 T.C. 1111; sec. 39.23(k)-2, Regs. 118. A sale by an accrual basis taxpayer cannot be regarded as complete, or the consideration accruable, until the liability of the purchaser to make payment of the purchase price to the seller has become fixed. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, affirming 67 F. 2d 385; Federal Machine & Welder Co., 11 T.C. 952, affd. 184 F. 2d 843; Vallejo Bus Co., 10 T.C. 131, affd. 171 F. 2d 747. If the contract of sale contains *142 a condition precedent, the sale is not complete or the purchase price accruable until the condition is satisfied. Federal Machine & Welder Co., supra; Vallejo Bus Co., supra.A sale contract which makes acceptance of the subject matter dependent upon inspection or testing by the purchaser creates such a condition precedent and prevents accrual of the purchase price by the seller until such tests and inspections have been made. Webb Press Co., Ltd., 3 B.T.A. 247; Webb Press Co., Ltd., 9 B.T.A. 238; Federal Machine & Welder Co., supra; cf. Florence Mills, Inc., 9 B.T.A. 579. The contract here involved (Contract No. AF 49(147)-79) was executed by petitioner and the United States Government on September 22, 1950, and called for the delivery of 9,000 multi-ring binders of specified construction, at a total price of $9,900. The contract contained the following provision: 5. INSPECTION (a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent *143 practicable at all times and places including the period of manufacture, and in any event prior to final acceptance. * * *
11. DEFAULT (a) The Government may, subject to the provisions of paragraph (b) below by written Notice of Default to the Contractor terminate the whole or any part of this contract * * * The Government did not inspect the binders during the course of production. On December 7, 1950, 3,000 binders were delivered by Ringmaster to the specified delivery point. On December 8 and 12, 1950, these binders were inspected by a contracting officer, found to be defective, and rejected. Petitioner was formally notified by telegram on December 19, 1950, of the termination of the contract. On March 9, 1951, Ringmaster filed an appeal from the termination of the contract with the Armed Services Board of Contract Appeals. This appeal was denied on September 28, 1951. As we read the contract in question, the above-quoted provision containing the words "All supplies * * * shall be subject to inspection and test by the Government * * * in any event prior to final acceptance," operates clearly to create a condition precedent which prevented a completed sales transaction *144 from arising until inspection and tests had been made. Because of this condition and the express right of the Government to terminate the contract, no fixed right on the part of Ringmaster to receive the agreed consideration arose until inspection was made and the merchandise was either accepted by the Government or subsequently was determined to be acceptable by the Armed Services Board of Contract Appeals or otherwise. Petitioner clearly was not entitled to accrue the stipulated purchase price so long as the possibility existed that the binders might be rejected. Webb Press Co., Ltd., 3 B.T.A. 247, supra. The merchandise here involved was rejected on inspection and the Government's action in terminating Contract No. AF 49(147)-79 was sustained by the Armed Services Board of Contract Appeals. Petitioner did not further contest or appeal the matter. In these circumstances, since petitioner was not entitled to accrue and report as income the $5,518.70 amount it returned for the taxable year November 30, 1950, and the $2,979.90 amount it reported for the taxable year ended November 30, 1951, the respondent correctly eliminated those amounts from petitioner's income *145 for those years. We accordingly hold that petitioner did not sustain the losses claimed by it in the amount of $8,498.60 as a "bad debt" deduction on its income tax return for the taxable year ended November 30, 1952, and respondent's disallowance thereof must therefore be sustained. Issue 3. "Brokerage Fees." Findings of Fact During the taxable year ended November 30, 1951, Ringmaster received a total of $55,371.98 from Albert Fein out of a series of loans made by him to the corporation for which he received notes in the aggregate principal amount of $58,204.55. The difference between the face value of these notes and the total sum received by Ringmaster, namely, $2,832.57, was entered on the corporation's books as "brokerage fees." During the taxable year ended November 30, 1952, Ringmaster received a total of $324,045.76 from Albert Fein out of a series of loans made by him to the corporation, for which he received notes in the total amount of $338,280.94. The difference between the face value of these notes and the total sum received by Ringmaster, namely, $14,235.18, was entered on the corporation's books as "brokerage fees." Ringmaster paid the sum of $200 to Joe *146 Ludwig during the taxable year ended November 30, 1953, as a commisison for obtaining a loan for the corporation from Manufacturers Bank. This amount was charged on Ringmaster's books to an account entitled "Brokerage Fees." During the taxable years ended November 30, 1952 and 1953, Ringmaster paid Albert Fein the respective sums of $5,505.61 and $28,100.97 as commissions for either obtaining various loans for the corporation from United Bank and Trust Company or for guaranteeing such loans. These amounts paid Albert Fein were charged on Ringmaster's books and records to an account entitled "Brokerage Fees." During the taxable year ended November 30, 1951, the Amherst Corporation advanced a total of $29,750 to Ringmaster which issued a series of notes in the total principal amount of $35,000 to Amherst. In 1951 Ringmaster recorded this loan on its books as $29,750 and in 1952 it recorded the difference between that amount and the face value of the notes, namely, $5,250, as a "Brokerage Fee to Amherst." The respondent has determined that each of the foregoing loan premiums, bonuses, or commissions designated by petitioner as "brokerage fees" constitutes interest on borrowed capital. *147 Opinion Respondent has taken the position that the amounts paid by Ringmaster during its fiscal years ended November 30, 1951, 1952, and 1953, in connection with the procuring of loans constituted interest on borrowed capital within the meaning of sections 433(a)(1)(N) and 433(a)(1)(O) of the Internal Revenue Code of 1939. [1]
*148 Petitioner concedes on brief that the amounts paid by it during the years in issue to the lender as a premium on a loan, in addition to his regular interest charge, constitute interest on borrowed capital but contends that amounts paid to a third party as a "commission" for securing for it a willing lender or for guaranteeing payment represent compensation for services rendered rather than interest. All such amounts regardless of whether paid to the money lender or to a third party consistently were designated by petitioner on its books and records as "brokerage fees." Interest has been described as "compensation for the use or forbearance of money," Deputy v. Du Pont, 308 U.S. 488. The question whether a bonus or premium paid the lender for the use of money constitutes interest on borrowed capital from the standpoint of the taxpayerborrower was presented in L-R Heat Treating Co. 28 T.C. 894. We there held that such amounts represent interest within the meaning of sections 433(a)(1)(N) and 433(a)(1)(O) of the 1939 Code, stating as follows, at page 897: Here *149 it is admitted there was a negotiated bonus or premium to be paid the lender as a prerequisite to obtaining borrowed capital. The fact that here the amount of the bonus or premium was withheld by the lender, and in the abovecited case the bonus was paid back to the lender, is immaterial. * * * The fact that the parties did not call the premium or bonus interest and that the petitioner did not treat the bonus or premium on its books as interest is likewise immaterial. * * *
We are convinced that the only reason petitioner contracted to pay a premium or bonus to the lender was for the use of borrowed capital. The petitioner, in fact, admits this by stating that the premium was demanded and paid solely as a prerequisite to obtaining the necessary funds to finance its business operations. * * * In Helvering v. Union Pac. R. Co., 293 U.S. 282, the Supreme Court held that amounts paid by the taxpayer as commissions to bankers for marketing certain bonds issued by the taxpayer corporation represented part of the actual cost of borrowed capital and were properly chargeable to capital account and amortizable over the life of the bonds, the Court stating: Both commissions *150 and discount, as the Government concedes, are factors in arriving at the actual amount of interest paid for the use of capital procured by a bond issue. The difference between the capital realized by the issue and par value, which is to be paid at maturity, must be added to the aggregate coupon payments in order to arrive at the total interest paid. Both discount and commissions are included in this difference. * * * [Italics added.] In view of the foregoing decisions we are of the opinion that the amounts paid by Ringmaster as commissions to third parties for securing loans represent part of the cost of procuring the use of borrowed funds and properly should be characterized as interest. Although the amounts in question may well have been regarded by the recipient thereof as compensation, it is obvious that from the standpoint of the borrower (petitioner) such amounts were a prerequisite to obtaining the loans. It could make little difference to petitioner whether the amounts in question were regarded as "premiums," "commissions," or "brokerage fees," and such labels are of no importance in resolving the question presented here. The critical factor is that all such amounts were *151 a part of the cost it was obligated to pay and did pay for the use or forbearance of funds. Consequently, we hold that the amounts in question which were paid by petitioner during the years in issue to a third party for the purpose of securing loans represent part of the cost of procuring borrowed capital and constitute interest thereon within the meaning of sections 433(a)(1)(N) and 433(a)(1)(O) of the 1939 Code. Issue 4. Amount of Accrued "Brokerage Fees" Opinion The respondent has determined that the deduction claimed by Ringmaster for "brokerage fees" on its income tax return for its fiscal year ended November 30, 1952, was not allowable to the extent of $2,100 because it included expenses in that amount which actually had accrued during a prior year. Petitioner has offered no evidence with respect to this issue and does not argue or otherwise mention it on brief. Because petitioner has failed to sustain its burden of proof on this issue, we leave the parties where we find them and respondent's determination is sustained. Issue 5. Legal Fees (Ringmaster) Findings of Fact During the taxable year ended November 30, 1952, Ringmaster issued checks in the aggregate *152 principal amount of $2,000 to the law firm of Schur, Handling and Jeffrin of New York City and Joseph Brill, an attorney from New York City. During the taxable year ended November 30, 1953, Ringmaster issued checks in the aggregate principal amount of $6,000 to Joseph Brill, an attorney from New York City. The aforesaid checks in the total amount of $8,000 were issued by Ringmaster in payment of legal expenses incurred by Irving. These legal expenses related either to Irving's indictment and conviction for income tax evasion or to a civil suit in which he was involved. All of the checks were drawn on funds of Ringmaster solely for Irving's benefit. No corporate purpose was served by the payment of the personal obligation of Irving. Sylvia's sole ownership of the stock of Ringmaster remained unchanged as a result of these payments. As of November 30, 1952, Ringmaster had available earnings and profits sufficient to pay a dividend in the amount of $2,000. On November 30, 1953, it had accumulated earnings and profits of $12,240.07. On its income tax returns for its fiscal years ended November 30, 1952 and 1953, Ringmaster claimed deductions for the abovedescribed payments in *153 the amounts of $2,000 and $6,000, respectively. The respondent disallowed in full the foregoing deductions and further determined that these payments constitute constructive dividends to Sylvia for 1952 and 1953. Opinion The amounts here in issue represent legal fees which were incurred by Irving Federbush and were paid by Ringmaster solely for his personal benefit. Such amounts would be deductible by Ringmaster only to the extent that they can be shown to constitute compensation to Irving or ordinary or necessary expenses of conducting the business of the corporation. Petitioner has failed to establish that either the corporation or Irving regarded the payment of these legal fees as compensation to him and we so hold. Since the payments in question were not compensation and were made solely for the personal benefit of Irving and since petitioner has not shown and does not seriously contend that these payments were ordinary and necessary expenses of carrying on the business of Ringmaster, we are unable to accept its contention that these amounts are properly deductible. Attorneys' fees *154 paid by a corporate employer on behalf of its employee in connection with his personal litigation are not ordinary and necessary business expenses of the corporation. Chenango Textile Corporation v. Commissioner, 148 F. 2d 296, affirming 1 T.C. 147. Respondent has further determined that the $2,000 legal fee incurred by Irving and paid by Ringmaster in 1952 and the $6,000 legal fee paid by the corporation on his behalf in 1953 constitute constructive dividends to Sylvia for those years. At all times here material, Sylvia owned all the outstanding stock of Ringmaster and was in complete control thereof. She also had complete control of the corporation's books and records. Consequently the expenditures in question which were made for the sole benefit of her husband could not have been made without her knowledge and consent. No corporate purpose was served by the payment of the personal obligations of Irving, and Sylvia's sole ownership of Ringmaster remained unchanged as a result thereof. The corporation had earnings and profits of at least $2,000 as of November 30, 1952, and as of November 30, 1953, it had accumulated earnings and profits to the extent *155 of $12,240.07. Accordingly, we hold that the amounts paid by Ringmaster as legal fees on behalf of Irving during 1952 and 1953 constitute constructive dividends to Sylvia and are not deductible by the corporation. Clark v. Commissioner, 84 F. 2d 725, affirming 31 B.T.A. 1082. Issue 6. Legal Fees (Irving) Findings of Fact Irving and Sylvia claimed a deduction on their joint return for each of the years 1952 and 1953 for legal expenses in the respective amounts of $2,400 and $6,000. Seven thousand dollars of the total claimed deduction of $8,400 was expended for legal services rendered Irving in connection with a criminal proceeding in which he was under indictment. One thousand dollars of the $2,400 deduction claimed for legal fees for 1952 was paid in 1952 to the law firm of Schur, Handling, and Jeffrin of New York City for legal services rendered Irving in connection with a "civil suit." The respondent disallowed the entire deduction claimed by petitioners for legal expenses for 1952 and 1953. Opinion Petitioners have conceded at the trial that approximately $7,000 of the total amount ($8,400) claimed by them as a deduction for legal fees *156 for 1952 and 1953 represented fees paid for services rendered in connection with a criminal proceeding in which Irving was under indictment and is to that extent not deductible. They contend on brief that $1,000 of the $2,400 deduction claimed for legal fees for 1952 was paid for services rendered in connection with certain civil litigation and that such amount therefore is properly deductible. The record discloses only that the amount in question was incurred by Irving during 1952 and was paid to the law firm of Schur, Handling, and Jeffrin of New York City for legal services connected with a "civil suit." The nature and purpose of the suit and the possibility of its connection with some business or income-producing activity conducted by petitioners during 1952 is left otherwise unexplained. On the basis of such meager and indefinite testimony we are unable to hold that the $1,000 fee here in issue was expended for the purpose of carrying on a trade or business, or for the production of income, or for the conservation and maintenance of property held for the production thereof. Sec. 23(a), 1939 Code. Therefore, in the absence of proof sufficient to establish error in the respondent's *157 determination, we must sustain his determination. Issue 7. Additional Income Findings of Fact The separate return originally filed by Irving for 1952 disclosed "other income" in the amount of $330.08. The joint return subsequently filed by Irving and Sylvia for the taxable year 1952 did not include in reported income the aforesaid "other income" in the amount of $330.08. The respondent determined that petitioners Irving and Sylvia received "other income" in the amount of $330.08 during 1952 which they did not report on their joint return for that year. Opinion The respondent has determined that petitioners Irving and Sylvia Federbush received additional income during 1952 in the amount of $330.08, which they failed to report on their joint income tax return for that year. Petitioners have failed to offer any evidence with respect to this issue and they do not argue or otherwise mention it on brief. Inasmuch as the record herein is totally lacking in proof as to the item here in question, we sustain the respondent's determination. Issue 8. Dividend Distribution Findings of Fact At all times subsequent to August 22, 1950, Sylvia held all the outstanding capital *158 stock of Ringmaster. During the period August 22, 1950, to November 30, 1953, the outstanding capital stock of Ringmaster consisted of 8,500 shares of common stock having a stated value of $5 per share and 200 shares of preferred stock having a par value of $100 per share. On November 30, 1953, Sylvia surrendered 179 shares of her aforesaid preferred stock to Ringmaster at par value of $100 per share. This stock was surrendered by Sylvia in consideration of Ringmaster's cancellation of an indebtedness due from her in the amount of $7,462.95 and the cancellation of an indebtedness due Ringmaster from Irving in the amount of $10,437.05. These debts were in the nature of open accounts which represented a series of withdrawals from corporate funds Irving and Sylvia had made during the period May 31, 1950, through November 30, 1953. The withdrawals were made by them to cover the cost of their personal living expenses and solely for their personal purposes. In his notice of deficiency, the respondent determined that the cancellation by Ringmaster of the above-mentioned debts due from Irving and Sylvia in exchange for 179 shares of Sylvia's preferred stock constituted a distribution essentially *159 equivalent to a taxable dividend for 1953 to the extent of Ringmaster's earnings and profits. The accumulated earnings and profits of Ringmaster as of November 30, 1953, amounted to $12,240.07. Ultimate Finding The cancellation by Ringmaster, Inc., of the indebtedness of Irving and Sylvia Federbush in exchange for 179 shares of Sylvia's stock during 1953 constituted a distribution essentially equivalent to a dividend. Opinion Petitioners contend that the surrender by Sylvia of 179 shares of preferred stock to Ringmaster in 1953 represented the repayment by the corporation of certain "loans" she previously had made to it and did not result in a dividend distribution. If Ringmaster was indebted to Sylvia and such debt was related in any way to the reacquisition by the corporation of 179 shares of its preferred stock in 1953, petitioners have failed to establish its existence and the nature or amount thereof. The amounts advanced to the corporation by Sylvia in 1950 clearly appear to have constituted her initial capital investment for which she received 200 shares of preferred stock. There is no indication in the record that her surrender of 179 shares of that stock to Ringmaster *160 on November 30, 1953, was regarded either by Sylvia or the corporation as the repayment of any indebtedness owed her by it. The transaction in question resulted in the cancellation by Ringmaster of certain open accounts due it from Irving and Sylvia in the amounts of $10,437.05 and $7,462.95, respectively, which had arisen from a series of withdrawals they had made from corporate funds during the period May 31, 1950, through November 30, 1953. Such withdrawals were made by them solely for their personal use. Inasmuch as Sylvia was the sole stockholder of Ringmaster both before and after the transaction in question, her ownership and control of the corporation were unaffected thereby. Petitioners have failed to show the purpose of Ringmaster in canceling the indebtedness owed it by Irving and Sylvia upon recipt of 179 shares of Sylvia's stock. They do not suggest that there existed any corporate purpose for this transaction or that it represented a contraction of Ringmaster's business. The corporation had accumulated earnings and profits at the close of its fiscal year ended November 30, 1953, in the amount of $12,240.07. Under the foregoing circumstances we hold that the reacquisition *161 by Ringmaster of 179 shares of its preferred stock from Sylvia on November 30, 1953, constituted a distribution essentially equivalent to a taxable dividend, to the extent of the accumulated earnings and profits of the corporation. J. Natwick, 36 B.T.A. 866; Ferro v. Commissioner, 242 F. 2d 838, affirming a Memorandum Opinion of this Court; Genevra Heman, 32 T.C. 479, affd. 283 F. 2d 227. Decisions will be entered for the respondent. Footnotes
1. SEC. 433. EXCESS PROFITS NET INCOME. (a) Taxable Years Ending After June 30, 1950. - The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income, as defined in section 13(a)(2), for such year increased or decreased by the following adjustments: (1) Adjustments. - * * *
(N) Interest - Credit Based Upon Invested Capital. - If the excess profits credit for the taxable year is computed under section 436 the deduction for interest shall be reduced by an amount equal to 75 per centum of so much of such interest as represents interest on the indebtedness included in the daily amounts of borrowed capital (determined under section 439(b)). (O) Interest - Credit Based Upon Income. - If the excess profits credit for the taxable year is computed under section 435, the deduction for interest shall be reduced by an amount which bears the same ratio to the interest on the indebtedness included in the daily amounts of borrowed capital (determined under section 439(b)) as the excess of the amount determined under section 435(g)(3)(C) over the aggregate, divided by the number of days in the taxable year, of the amount determined under section 435(g)(4)(E) for each day of the taxable year, bears to the average borrowed capital for the taxable year (as defined in section 439(a)↩).