THE FEDERAL MACHINE AND WELDER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13715. Promulgated November 30, 1948.

*Eugene Meacham, Esq.*, and *Colman B. Stein, Esq.*, for the petitioner.

*Lawrence R. Bloomenthal, Esq.*, for the respondent.

LEMIRE, *Judge*: This proceeding involves deficiencies for petitioner's taxable year ended September 30, 1941, as follows: Income tax, $76,131.11; declared value excess profits tax, $16,740.33; and excess profits tax, $158,465.94.

The questions in issue are (1) whether the income from the sale of equipment which the petitioner manufactured for export accrued in petitioner's taxable year ended September 30, 1940, when the work was substantially completed, or in 1941, when the sale was finally consummated; (2) whether, and to what extent, if any, the compensation which the petitioner paid or accrued to its president in 1941 was excessive; and (3) whether bonuses computed on 1940 and 1941 profits, which the petitioner authorized and paid to certain of its officers and employees in the taxable years 1941 and 1942, are accruable in the latter years or in 1940 and 1941.

### FINDINGS OF FACT.

The petitioner is an Ohio corporation, with its principal place of business located at Warren, Ohio. Its returns for the taxable year were filed with the collector for the eighteenth district of Ohio. The

returns were made on an accrual basis, in accordance with the petitioner's method of keeping its books and accounts.

The petitioner is engaged in the business of manufacturing electrical welding machines and other equipment.

One of the petitioner's principal clients was Amtorg Trading Corporation, the official purchasing agency for the Russian Government. Early in the fall of 1939 the petitioner's president, Malcolm S. Clark, was called on the phone by B. M. Shubin, an official of Amtorg, and asked to come to Amtorg's office to discuss a very important job. He did so a few days later and had a discussion with several of Amtorg's officials. The proposed job consisted, essentially, of welding the end of a three-inch steel tube onto a three-eighth-inch steel plate to form what the Russians referred to as a "heavy shock absorber." Actually, what Amtorg wanted petitioner to make, as finally disclosed, was a machine to manufacture steel shell cases by the electric welding process. Clark explained that to his knowledge this particular type of welding had never before been done, but that his company, the petitioner, would undertake it.

Experiments were begun immediately in the petitioner's laboratories and were continued until February 1940. Altogether, some 3,000 experimental weldings of the type specified were made under the supervision of Clark and his assistants at petitioner's plant before a satisfactory technique for the welding operation had been worked out. After this technique was demonstrated to the satisfaction of the Amtorg officials they gave the petitioner a formal purchase order, No. 11–50/08820, dated April 20, 1940. The order specified certain "machinery, including electrical welding equipment for the production of exhaust pipes. The exhaust pipes are to have the following specifications." The specifications that followed were obviously for shell cases and had nothing to do with exhaust pipes. There was set out in considerable detail a description of the component parts and functions of the complete machine with which the shell cases were to be manufactured. The contract price, as specified in the purchase order, was $400,000 net total f. o. b. cars New York, boxed for export to U. S. S. R. The purchase price was to be paid $100,000 cash (irrevocable letter of credit), $25,000 each month for 4 months, and the remaining $200,000 against bill of lading upon completion of the order. Delivery was to be made on August 15, 1940. There were various provisions in the contract for inspection and tests, including the following:

* * * The final inspection fe [*sic*] of the machinery, and the acceptance of samples manufactured by the above equipment, is to be in strict accordance with specifications of this order, and should be made according to schedule, attached hereto, and which becomes a part of this order.

A part of the equipment called for by the Amtorg contract was a machine for making the steel tubing. The petitioner subcontracted with the Yoder Co., of Cleveland, Ohio, for this machine, which was one of its standard products. The petitioner obtained its experimental steel tubing from Yoder. It manufactured twenty-five experimental shell cases, which Amtorg shipped to Russia during 1940. The machine performed satisfactorily at that time. Amtorg later received instructions from Russia that a mistake had been made in the specifications as to the type of steel to be used. The contract specified S. A. E. 10–10 steel, whereas, it was said, 10–15 steel should have been used. Thereafter, seventy-five additional shell cases of 10–15 steel were manufactured and shipped to Russia. After experiments with these the Russian authorities notified Amtorg by cable that in firing the cases had developed a structural weakness, and suggested that the base be reinforced in the welding process or that a stronger type of steel, 10–20, be used in both the tube and the base. Early in September the petitioner quoted Amtorg a price of $147,000 to cover the cost of the necessary changes in the welding equipment. Amtorg agreed to this price, but said that they would have to get final approval from Moscow. In the meantime, Yoder was pressing for final inspection and acceptance of the tube-forming machine which they had manufactured. This final inspection was delayed, however, on account of the inability of Yoder to supply the 10–20 steel for tests.

About the middle of September 1940, and before there had been any further material development in the negotiations between the petitioner, Amtorg, and Yoder, Clark received a telephone call from Acting Secretary of State Sumner Welles concerning the Amtorg order. Welles told Clark that our Government had information that the equipment was intended for use not by Russia, but by another country whose possession of it would not be favored by our Government, and that in all probability the export license for the equipment, which had already been obtained, would be canceled eventually. The petitioner was asked to cooperate in delaying the shipment for the time being and was told that an effort would be made by our Government to find another buyer for the equipment so that the petitioner would not suffer any loss. Clark agreed to, and did, cooperate in the matter of delaying the shipment to Russia.

There followed a series of written communications and telephone conversations between the petitioner, Yoder, and Amtorg regarding various matters relating to the proposed changes in the equipment and the final inspection and delivery thereof. The Russian officials were pressing for delivery as soon as possible, while, according to his promise, Clark was trying to delay it. The equipment was in fact never delivered to Amtorg and the export license was later canceled

by the State Department.  On September 22, 1940, the petitioner received the following letter from Amtorg:

Telephone LExington 2-8500

Cable Address
"Amtorg New York"

AMTORG TRADING CORPORATION
210 Madison Avenue
New York
September 22, 1940

In Your Reply Please
Mention Our Reference

Federal Machine & Welder Company
Warren, Ohio

Re: Order 50/08820

Gentlemen:

In accordance with the discussion in the writer's office, pertaining to increasing the strength of welded base to the tube so that the base will stand a total load against the base of approximately 77000 lbs.

We shall appreciate your cooperation in endeavoring to work this out either by re-designing the construction of the base to permit a reinforcement to be welded inside or by some other method which will increase the strength. We understand you will proceed immediately to make up some test samples to submit for pressure test and will quote us on any additional equipment that may be required to take care of additional operations for the extra parts, however, this experimental work is to be done without additional cost to us.

We request you to make the test and inspection of the equipment covered by the order, with the exception that you are to use 1020 steel instead of 1010 steel.

Very truly yours,

AMTORG TRADING CORPORATION
By: [Signed]  B. M. Shubin,
B. M. SHUBIN, *Director*
*Machineimport Department.*

BMS: d

P. S. In view of the above you may invoice us as of this date.

BS
[Signed]  B. M. SHUBIN.

Upon receipt of the above letter the petitioner sent an invoice to Amtorg, dated September 30, 1940.  On that date the petitioner accrued in its books as income the sale price of the equipment at the contract price of $400,000, and also accrued as a liability $22,800 sales commission to its Eastern representative.

The petitioner was notified by telegram on November 15, 1940, of the State Department's cancellation of the export license for the equipment.

In the meantime, the petitioner had been informed that the British Purchasing Commission was interested in acquiring the equipment, the transfer made on November 28, 1940.  The sale was made through and after further negotiations the transaction was consummated and another American company.  The purchase price was $400,000, as in

the contract with Amtorg. There was an addition of $1,125 to cover extra expenses. The $200,000 which Amtorg had paid to the petitioner on the contract was refunded, $100,000 in cash and $100,000 as a credit to Amtorg in petitioner's books on other contracts.

In its return for the fiscal year ended September 30, 1940, the petitioner reported net income from the Amtorg contract of $290,373.66, representing the difference between the contract price of $400,000 and costs of $109,626.34, as shown by the petitioner's books at September 30, 1940. The respondent determined that the profit on the contract accrued in 1941 rather than in 1940. Accordingly, he eliminated the $290,373.66 of accrued income from petitioner's 1940 return and added that amount to 1941 income.

OPINION.

The Commissioner has determined that the income of the equipment manufactured by the petitioner under the Amtorg contract was accruable in the petitioner's taxable year 1941, while the petitioner contends that it was properly accrued in 1940.

The accrual of an item of income depends upon a fixed, unconditional right to receive it. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. As related to the sale of property it presupposes a transaction substantially completed except for the payment of the purchase price, which must have become due and payable within the taxable year. Any material contingency as to the payment will prevent the accrual. In *Commissioner* v. *Segall*, 114 Fed. (2d) 706, the court said:

There are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality. Passage of title is perhaps the most conclusive circumstance. *Brown Lumber Co.* v. *Commissioner*, 59 App. D. C. 110, 35 F. 2d 880. Transfer of possession is also significant. *Helvering* v. *Nibley Mimnaugh Lumber Co.*, 63 App. D. C. 181, 70 F. 2d 843; *Commissioner* v. *Union Pac. R. Co.*, 2 Cir., 86 F. 2d 637; *Brunton* v. *Commissioner*, 9 Cir., 42 F. 2d 81. A factor often considered is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. *Commissioner* v. *North Jersey Title Ins. Co.*, 3 Cir., 79 F. 2d 492; *Brunton* v. *Commissioner, supra; Case* v. *Commissioner*, 9 Cir., 103 F. 2d 283; *United States* v. *Utah-Idaho Sugar Co.*, 10 Cir., 96 F. 2d 756.

On the facts here we do not see how it can be said that the sale of the equipment to Amtorg was consummated or that there was an unconditional obligation for Amtorg to pay the petitioner the purchase price at September 30, 1940, the close of petitioner's fiscal year. There was no delivery of the equipment to Amtorg and no final inspection thereof, as required in the purchase order. The petitioner insists that final inspection was waived by the postscript which Shubin

added to the letter of September 22, 1940, to the effect that: "In view of the above you may invoice us as of this date." Whether the postscript should be considered as a valid modification of the contract we do not decide. What seems more important to us is the fact that before this letter was written, and before the close of the petitioner's taxable year, Clark had been informed by our State Department that the transfer of the equipment to the Russian officials was not favored by our Government and in all probability would not be permitted. Clark testified that at the time the letter was written and at the time the sale price was accrued as income in the petitioner's books he himself was doing all that he could to delay the completion and delivery of the equipment, in compliance with the request of the State Department.

These circumstances, we think, prevented any accrual of the income from the sale of the equipment during the petitioner's taxable year 1940. On this issue the respondent is sustained.

#### FINDINGS OF FACT.

Malcolm S. Clark has been president and general manager of the petitioner since 1937. He is an engineer by profession and has been so engaged since 1912. During World War I he was chief engineer for National Iron Corporation in Canada, which at that time had a shell tooling and forging job contract with the United States Government. Later he developed a centrifugal molding machine which his company patented and sold for several million dollars. He also developed and had patented a new type of fuel line which was widely distributed. He was later employed as a tool engineer by the Ford Motor Co. at Detroit, Michigan, where he soon became foreman of the special machine division. In that position he was responsible for all special machine designing and purchasing for the Ford Motor Co. In 1929 he left the Ford Motor Co. to become chief engineer for the Taylor-Winfield Corporation, becoming general manager of that company in 1930 and continuing in that business until his association with the petitioner in 1937. He was paid a salary by Taylor-Winfield of $15,000 per year, plus a bonus, and was promised a part interest in the business. However, he was never given an opportunity to acquire this interest, which was one of the reasons why he left the company to become associated with the petitioner.

Early in 1937 Clark was approached by the prospective purchasers of petitioner's capital stock and asked if he would agree to come with the petitioner as president and general manager, and also a director, with an opportunity to become a part owner of the business. He

agreed to do so.   He entered into a 5-year employment contract with the petitioner on March 31, 1937, under which he was to receive as general manager a salary of $15,000 a year, plus 7½ per cent of net earnings, as defined in the contract, with an option to purchase up to 30,000 shares of petitioner's common stock at $2.25 per share.   This was the same price at which the stock was being acquired by his associates.

In February 1940 the petitioner adopted a plan for establishing an extra compensation fund for its officers and other key employees.   The plan was designed to distribute a portion of petitioner's profits each year to certain officers and employees as incentive compensation.   It was conceived and formulated by Clark.   He felt that its cost to the petitioner would be more than offset by the increase in output and other advantages to be gained.   The plan was presented to the board of directors by Clark and adopted on February 19, 1940, to become effective in that year.   Under this plan the fund was to be managed and controlled either by the directors or by a committee of three to be appointed by them.   Paragraph III of the agreement provides as follows:

III. *Participants in the Fund.*

The only persons entitled to participate in the Fund are such of the officers and the department heads of the Company, and their executive assistants, and such other key employees as the Board of Directors or the Fund Committee may designate not later than the close of each fiscal year during the operation of the Extra Compensation Fund. The participations allotted to participants in the Fund shall be fixed by the Fund Committee and shall be selective and need not be uniform; and such participations may be reduced or increased from time to time after allotment but before the close of the fiscal year in the discretion of the Board of Directors or the Fund Committee, with or without cause. If a participant should die, the Fund Committee, in its discretion, may, but shall not be obligated to, allot the whole or a part of his participation to a member or members of his family, or to his personal representatives.

The amount of the fund was to be based on accelerated percentages of the petitioner's profits "as hereinafter defined, as conclusively determined by the public accountants regularly employed by the Company within 60 days after the close of each fiscal year."   It was further provided:

V. *Distribution.*

All payments from the Extra Compensation Fund shall be made in such proportion as the Board of Directors or the Fund Committee appointed by it shall determine and shall be paid by check within one hundred and twenty days after the close of each fiscal year as the Fund Committee may determine, to the persons entitled thereto in addition to any fixed salaries and other compensation, if any, of the recipients thereof.

It was further provided that none of the provisions of the plan were to limit, restrict, or modify the right of the directors in their discretion to fix the compensation of any officer or employee.

Clark's participation in the fund was contingent upon his waiving his rights under his original compensation agreement with the petitioner, which he did in writing on February 19, 1940.

After the close of the fiscal year ended September 30, 1940, the petitioner's accountants made a computation of the petitioner's profits for that year and determined that $83,652.79 was available for distribution to the officers and employees. The report was submitted to the petitioner on December 13, 1940. Thereafter, the board of directors approved the report of the accountants and allocated extra compensation to certain officers and employees whom they selected and in amounts which they agreed upon. The bonuses were paid to the recipients in part during 1940 and the balance early in 1941.

The extra compensation for the fiscal year ended September 30, 1941, amounted to $71,806.43. It was determined and paid to the recipients in substantially the same manner as that for 1940. The report of the accountants determining the amount of the fund was dated November 17, 1941. The report was later approved by the board of directors and the bonuses were distributed prior to, or soon after, the close of that calendar year.

In its books the petitioner accrued the bonuses paid to its officers and employees for each of the years 1940 and 1941 as an expense of the succeeding taxable years; that is, the 1940 bonuses were accrued as an expense of 1941 and the 1941 bonuses as an expense of 1942. The respondent has determined that these bonuses, to the extent that they constitute ordinary and necessary business expenses, were accruable in each of the taxable years for which they were paid and are deductible in those years. He determined, however, that reasonable compensation for the petitioner's president, Malcolm S. Clark, for each of the years 1940 and 1941 was not in excess of $25,000. Clark's total compensation for 1940 was $52,711.40, including his regular annual salary of $15,000, plus a bonus under the new plan of $37,711.40. The Commissioner disallowed $27,711.40 of the 1940 bonus paid to Clark in 1941 and $21,855.38 of the 1941 bonus paid to him in 1942.

Clark has been the chief executive officer of the petitioner and has had virtual control of its operations since he came with the company in 1937. He has had charge of the engineering, manufacturing, and sales. He represented the petitioner in most of its important dealings with our own and foreign governments. Under his supervision the petitioner's net sales increased from $824,580.12 in 1936 to over $1,000,000 in each of the years 1937, 1938, and 1939, and over $2,000,000 in 1940 and 1941. The petitioner reported net income of $632,603.75 for 1940 and $519,688.08 for 1941.

During the petitioner's taxable year 1941 Clark owned a maximum of 34,536 shares of the 295,764 outstanding shares of petitioner's common stock.

The total compensation of $52,711.40 paid to Clark for the fiscal year ended September 30, 1940, was reasonable compensation for the services which he performed for the petitioner in that year.

The questions involved in these issues are (1) whether the 1940 and 1941 bonuses, which were not authorized or paid to the petitioner's officers and employees until after the close of those taxable years were accruable expenses of 1940 and 1941, respectively, or of the succeeding taxable year during which they were authorized and paid; and (2) whether, and to what extent, if any, the compensation paid to petitioner's president, Malcolm S. Clark, in 1941 was in excess of reasonable compensation for the services performed by him.

We have found above that the total compensation of $52,711.40 paid to Clark for 1940 was not in excess of reasonable compensation for his services. That conclusion is based upon the evidence as to the type and value of his services to the petitioner, his special qualifications for the position which he held as petitioner's chief executive officer, the expansion of petitioner's business and the increase in its profits under his management, and other pertinent factors shown by the evidence.

This is not the case of an officer-stockholder fixing his own compensation so as to withdraw the profits of the business in the guise of compensation. Clark at no time owned more than a small percentage of the petitioner's outstanding shares. His employment and his compensation were matters agreed upon by him and the petitioner in arm's length transactions.

We think that the evidence as a whole supports the petitioner's contention that the compensation paid to Clark for 1940 was no more than reasonable in amount.

Our final question is whether the extra compensation paid to Clark and the other officers and employees for 1940 and 1941, but not authorized or paid to them until 1941 and 1942, respectively, is accruable in the latter years or in the years 1940 and 1941. The Commissioner has offered no argument on this issue in his brief.

At the close of 1940 there were no fixed amounts ascertained to be due and payable to any of the officers or employees as bonuses. There was no definite liability on the petitioner's part to pay any of the extra compensation to any of the participants. Under the plan agreed upon payments were not to be made until after the petitioner's profits for the taxable year had been computed by its accountants and after the board of directors had met and agreed upon the amount to be distributed, the persons who were to be benefited, and the amounts which each was to receive. None of these things had been done at the close of the petitioner's taxable year ended September 30, 1940. The petitioner's

liability to pay the 1940, but not the 1941, bonuses became definite and fixed and was correctly accrued by the petitioner as an expense of 1941. Correspondingly, the 1941 bonuses accrued in the petitioner's taxable year 1942. See *Taylor-Parker Co.*, 1 B. T. A. 1161; *Horn & Hardart Baking Co.*, 19 B. T. A. 704; *E. B. & A. C. Whiting Co.*, 10 T. C. 102.

Reviewed by the Court.

*Decision will be entered under Rule 50.*