SHIOCTON LUMBER CO., INC., a Wisconsin Corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Shiocton Lumber Co. v. Commissioner
Docket No. 3627-72.
United States Tax Court
T.C. Memo 1974-132; 1974 Tax Ct. Memo LEXIS 185; 33 T.C.M. (CCH) 599; T.C.M. (RIA) 74132; May 23, 1974, Filed. Wilford W. Elliott, for the petitioner. James L. Norris, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the calendar years 1969 and 1970 in the amounts of $16,684.79 and $21,473.51, respectively. The issue for the year 1969 is whether amounts deducted for compensation paid by petitioner to its two officer-employees were reasonable within the meaning of section 162, I. *186 R.C. 1954. [1] The issue for the year 1970 is whether bonuses were timely authorized to be paid to petitioner's two officer-employees for 1970 so as to be deductible in that year. If so, respondent contests the reasonableness of total compensation paid in 1970. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Shiocton Lumber Co., Inc. (hereinafter petitioner) is a Wisconsin corporation organized on January 8, 1962. At the time its petition in this case was filed, its principal office was in Shiocton, Wisconsin which has a population of 700 people. Petitioner filed its corporate income tax returns for the taxable years 1969 and 1970 on an accrual basis with the Internal Revenue Service Center at Kansas City, Missouri. Shiocton Lumber Co., Inc., was formed as a sole proprietorship in 1953, under the ownership and control of Louis Tackman (hereinafter Tackman) to engage in the lumber business. The lumber business was carried on successfully by Tackman from 1953 until 1962, during which time considerable goodwill was developed for the business. Tackman's sons, Clinton *187 and John, worked in the lumber business during these years part-time while finishing their high school education, and thereafter, except for Clinton's military service, full-time. In 1962, Tackman caused petitioner to be formed. Tackman transferred the business to the corporation but retained ownership of the land and buildings used in the business and leased these properties to petitioner. From 1962 until 1968 Tackman managed petitioner's business. He worked 14 to 18 hours per day, 7 days per week in the business. His duties included purchasing materials, designing structures, laying out construction jobs, selling, collecting, estimating, and generally supervising labor crews in the field. Tackman took only a few weeks total vacation in all these years. His salarly in 1967 was $28,314.96. Clinton and John worked under their father's supervision from 1962 to 1968 as employees, officers and directors of petitioner. John's duties were concentrated mostly on the construction aspects of the business overseeing crews at job sites, while Clinton worked in the lumber yard and did some selling, drafting, bookkeeping and estimating. John and Clinton worked more than a 40-hour week *188 during these years. During each year John and Clinton each worked a total of approximately 3,300 hours in petitioner's business. Gene Main is Tackman's son-in-law and was a stockholder, officer and director of petitioner prior to 1968. Gene Main worked for petitioner as a mason. He performed no supervisory services other than directing the work of two other masons. Gene Main also worked long hours. In recognition of their substantial efforts, Tackman devised a policy of paying Clinton, John, and Gene yearly bonuses in addition to their salaries. Petitioner did not employ any other persons in a supervisory capacity and did not pay bonuses to employees other than these three men. Annually, from 1965 through 1967, petitioner adopted a resolution authorizing payment of these bonuses to be computed as follows: First, there shall be determined the income before income taxes and before bonuses, from this amount shall be deducted the amount of five thousand dollars. Of the remainder, twelve percent shall be paid to Louis Tackman, and 50 percent shall be paid to Clinton Tackman, John Tackman, and Gene Main. The allocation of the 50 percent among the above-named three officers *189 shall be made by Louis Tackman, president of the corporation. After 1968, Clinton took on many of the duties which his father had previously performed in the area of selling, designing, estimating, and figuring jobs, as well as collecting. He also handled advertising, which consisted primarily of placing signs on jobs presently being done and recontacting prior customers. After 1968, the entire responsibility for managing petitioner shifted to John and Clinton. Tackman was and is still retained by petitioner as a consultant. He performs most of his work for petitioner at home in the evenings, devoting about 15 hours per week to checking his sons' estimates, doing some figuring, and handling some problems with customers, for which services he receives an annual salary of $5,200. On January 1, 1968, there were 630 shares of petitioner's common stock outstanding. This stock was owned as follows: Shares Louis Tackman
470
Clinton Tackman
72
John Tackman
60
Gene Main
28
Total
630
In February 1968, Tackman sold his 470 shares to Clinton and John for $180,010 to be paid over a 10-year period with interest thereon. The agreement further provided that *190 in the event a dividend was declared and paid by petitioner, Tackman could demand that this dividend be paid over to him to be applied to the unpaid balance of the principal sum due him. After the sale, the stock in petitioner was owned as follows: Shares
Percent Clinton Tackman
301
47.8
John Tackman
301
47.8
Gene Main
28
4.4
Total
630
100.0
For reasons not clear in the record, after 1967 Gene Mai For reasons not clear in the record, after 1967 Gene Main was no longer paid an annual salary by petitioner, but instead worked as a mason for hourly wages. His wages in 1969 were $6,654.80 as opposed to his salary of $16,800 in 1967. On September 1, 1970, Gene Main sold his 28 shares back to petitioner. After September 1, 1970, Clinton and John were the only shareholders of petitioner. From the date of incorporation until January 4, 1971, the board of directors for petitioner were: Louis Tackman Clinton Tackman John Tackman Gene Main At a meeting of the stockholders held at 7:00 p.m. on January 4, 1971, the following were elected directors and have been the directors since that date: Clinton Tackman Cynthia Tackman John Tackman
*191 Judith Tackman No dividend has ever been declared by petitioner. In 1968, petitioner's bonus policy was changed pursuant to a March 4 resolution which read: RESOLVED that if the Board of Directors feels that a bonus should be paid, providing profits are such, they have the right to do so. A similar resolution was adopted for 1969, pursuant to which bonuses for 1969 were authorized on December 29, 1969. On January 5, 1970, the board of directors adopted the following similar resolution: RESOLVED That, if profits are favorable, the Board of Directors has the right to pay bonuses. There was no formal board of directors' meeting in December of 1970 to authorize bonuses. Clinton and John did discuss payment of a bonus in December 1970, but they did not determine the exact amount until a meeting of the board of directors of petitioner held at 8:00 p.m. on January 4, 1971. This meeting which authorized a bonus of $23,000 each to John and Clinton was of directors elected at the 7:00 p.m. stockholders meeting held on January 4, 1971. The minutes of a special meeting of petitioner's board of directors on June 21, 1971, read as follows: A discussion followed concerning *192 the audit by the Internal Revenue Service. The President of the company, John S. Tackman, informed the directors that during the past years it has been the policy of the Board of Directors to compensate the officers according to the results achieved by said officers. He also said that at all times during the past years they had consulted very closely with their C.P.A. as to the amount of compensation that was deductible by the corporation and that could be paid to the officers without any problems.It was agreed by all directors that it has always been the policy of the company to pay only those amounts deductible by the corporation and that would be reasonable compensation for the officers. The directors all agreed that all compensation to the officers paid in the past was based on their opinion and the opinion of their C.P.A. tax advisor that said amounts were deductible and that it was the intent of the Board of Directors to pay only those amounts that were deductible by the corporation. * * * The 1970 bonus was not discussed with petitioner's accountant, Robert J. McComb, prior to January 1971 when he undertook the preparation of the 1970 corporate tax returns and closed petitioner's *193 books for that year. At that time, as in previous years, he encouraged the payment of bonuses to John and Clinton in recognition of their excellent managerial services rendered during 1970. The following adjusting entry to petitioner's "labor" account was dated December 31, 1969, and read: Debit
Credit Labor
$52,000
Accrued salaries
$52,000
To accrue the following
bonuses:
John Tackman - $25,000
Clinton Tackman - 25,000
Gene main - 2,000
An adjusting entry to the "wages" account of petitioner was dated December 31, 1970, and read: Debit
Credit Wages
$46,000
Accrued salaries
$46,000
To accrue the following
bonuses:
John Tackman - $23,000
Clinton Tackman - 23,000
Prior to 1968 petitioner's gross sales consisted of approximately 50 percent retail sales and 50 percent from construction. In 1969 and 1970 retail sales made up approximately 20 percent of total sales, farm building construction approximately 40 percent of total sales, home construction approximately 30 percent of total sales, and commercial construction approximately 10 percent of total sales.
Petitioner had the following gross sales, cost of goods *194 sold, gross profit, bad debt recoveries, operating expenses and net income for the years 1962 through 1970: Year
Gross sales
Cost of
Gross
Bad debt
Operating
Net income
goods sold
profit
recoveries
expenses
before
taxes
1962
$326,629.25
$204,500.79
$122,128.46
$-
$ 99,233.94
$ 22,894.52
1963
369,701.00
-
120,843.00
-
-
15,263.23
1964
510,272.57
351,161.50
159,111.07
-
130,920.24
28, 190.83
1965
559,223.71
385,391.20
173,832.51
-
151,698.89
22,133.62
1966
637,250.14
429,491.09
207,759.05
-
1 82,398.70
25,360.35
1967
643,790.39
420,600.40
223,189.99
-
197,491.42
25,698.57
1968
741,641.10
478,453.25
26 3,187.85
-
246,235.41
16,952.44
1969
838,546.31
538,992.38
299,553.93
9 ,154.67
268,132.75
40,575.85
1970
884,285.10
545,584.49
338,700.61
6,996.54
326,538.32
19,158.83
Petitioner's business has been highly competitive and has shown profits during a period that some lumber yards in the surrounding vicinity have gone out of buisness. One of petitioner's competitors is Clintonville Lumber & Supply Co., Inc. (hereinafter referred to as Clintonville Lumber Company) *195 which is located in Clintonville, Wisconsin. Clintonville Lumber Company had the following gross sales, net income before income taxes, and total assets for 1968, 1969, and 1970: Year
Gross sales
Net income
Total assets before income
taxes
1968
$ 838,042.30
$42,369.07
$ 452,479.49
1969
919,805.94
16,761.76
662,721.92
1970
1,091,364.43
22,365.02
698,927.87
Twenty-five percent of Clintonville Lumber Company's gross sales were retail, 25 percent from residential construction, 40 percent from farm building construction, and 10 percent from commercial construction. Al Torborg was president and general manager of Clintonville Lumber Company and he and his wife owned all of the stock of that company during 1969 and 1970. He was responsible for commercial sales, estimating on commercial and residential projects, purchasing, accounts receivable and general work in connection with running the business. He worked an average of 50 hours a week without vacations and his annual salary for each of the years 1969 and 1970 was $29,500. Al Torborg has been in the lumber business since 1938 and has been doing bidding and estimating since 1945. He *196 has owned Clintonville Lumber Company for the last 10 to 15 years. Clintonville Lumber Company employs from 35 to 100 employees a year, all of whom are hired by Al Torborg. It employs a sales manager for the farm building division who designs, sells, and supervises the employees in that division. This sales manager worked between 50 and 55 hours per week and received an annual salary for each of the years 1969 and 1970 from Clintonville Lumber Company of $17,500. Clintonville Lumber Company also employs a person to do drafting, pricing of invoices, and work as counterman in the retail store. This employee received an annual salary including bonus, for each of the years 1969 and 1970 from Clintonville Lumber Company of $10,000. In addition to a bonus paid by Clintonville Lumber Company to Al Torborg, it pays a bonus to three employees who are not officers. ClintonvilleLumber Company has never declared dividends. Petitioner paid its officer-employees the following salaries including year-end bonuses for the years 1962 through 1970: Year
Louis Tackman
Clinton
John Tackman
Gene Main
Total Tackman
1962
$17,999.20
$ 8,000.00
$ 8,035.00
$-
$ 34,034.20
1963
17,992.00
9,200.00
9,180.00
8,905.00
45,277.00
1964
18,388.00
11,625.00
11,625.00
11,625.00
53,263.00
1965
23 ,901.88
16,500.00
14,500.00
13,124.50
68,026.38
1966
28,314.96
21,367.72
19,500.00
15,500.00
84,682.68
1967
28 ,314.96
22,667.72
20,800.00
16,800.00
88,582.68
1968
-
35,800.00
35,800.00
-
71,600.00
1969
-
45,800.00
45,800.00
-
91,600.00
1970
-
49,000.00
49,000.00
-
98,000.00
*197 For the years 1962 through 1967, John and Clinton were adequately compensated for the services they performed for petitioner. During 1969 and 1970, John was 30 and 31 years of age, respectively, and Clinton was 33 and 34 years of age, respectively. Respondent in his notice of deficiency determined that the 1969 salaries paid by petitioner to Clinton and John were unreasonable and disallowed the deductions claimed by petitioner therefor to the extent of $31,600. Respondent disallowed the deduction claimed by petitioner in 1970 for bonuses of $46,000, stating as a reason therefor that petitioner did not incur a legal obligation to pay these amounts until after December 31, 1970. In the alternative respondent determined that if the 1970 bonuses were properly accrued in 1970, the deductions claimed by petitioner for officers' salaries paid in 1970 were unreasonable to the extent of $37,168.88. OPINION Section 162(a) (1)[2] and section 1.162-7, Income Tax Regs., [3] allow a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" including a "reasonable allowance for salaries. " The primary question *198 for 1970 is whether all events authorizing payment of a $23,000 bonus each to Clinton and John occurred prior to December 31, 1970, the year for which petitioner took the deductions for these bonuses. Petitioner uses an accrual method of accounting, and, therefore, is governed by section 1.461-1(a) (2), Income Tax Regs., which states that "an expense is deductible for the taxable year in which all the events have occurred *199 which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." In this case, petitioner concedes that no formal authorization for bonuses for the year 1970 was made by the board of directors prior to the January 4, 1971 resolution. Clinton at one point testified that he and his brother had informally agreed to pay themselves a bonus similar to that they received in 1969 prior to the end of the year 1970 and at another time testified that they had informally agreed to a $23,000 each bonus prior to the end of 1970. Neither John nor petitioner's accountant corroborated this testimony. John testified that prior to the end of 1970 he was aware that he would receive some money as a bonus in accordance with petitioner's established policy in that regard but that he did not recall that the amount thereof was determined prior to January 4, 1971. The evidence shows that petitioner's accountant was customarily consulted prior to the setting of the amount of the yearly bonus petitioner would pay and that he did not remember being consulted as to the amount of a 1970 bonus until sometime in 1971. We have long recognized the lack of formality *200 with which many closely held corporations function and recognized actions at informal meetings of all the directors as being authorization for corporate action. See Reub Isaacs & Co., Inc., 1 B.T.A. 45, 48 (1924). We have allowed a deduction for bonuses accrued in one year upon the direction of the directors or a person authorized to act for them, but not evidenced by a formal resolution in the corporate minute books until the following year. Moore & Evans, 24 B.T.A. 45 (1931). At the same time, we have required that the taxpayer prove that such bonuses were informally authorized and that the amounts thereof were determined prior to the end of the year for which the deduction was allowed. Bauer Bros. Co. v. Commissioner, 46 F.2d 874 (C.A. 6, 1931), affirming 9 B.T.A. 392 (1927), certiorari denied 283 U.S. 850 (1931); Bray & Kates Co., 3 B.T.A. 1316 (1926). The facts in this case are similar to those in Bauer, where three brothers who were the majority stockholders and direcotrs of the taxpayer corporation, were among those employees paid bonuses for the year 1918 pursuant to a resolution passed by the *201 board of directors in March 1919. No book entry or written memorandum relating to the bonuses was made during 1918. Although the taxpayer's policy of paying bonuses was well known, amounts of bonuses were not settled until March 1919 when the necessary book entries were entered which credited these amounts to accounts of the employees before closing the books for 1918. From the record, the Court concluded that prior to 1919 there did not exist an enforceable legal obligation on the part of the taxpayer-corporation which would indicate that the bonus expense had been incurred furing the earlier year. Accordingly, the deduction for bonuses for 1918 was denied. The same reasoning applies here. The formal authorization of bonuses took place on January 4, 1971. The book entries evidencing their authorization were made early in 1971, in the course of closing the corporation's books for 1970. Although John and Clinton may have discussed generally their plan to take a sizeable bonus for 1970, there is only the unsupported testimony of Clinton to indicate that the amount of these bonuses had been determined in 1970. Clinton's testimony was not clear and precise as to when discussions *202 took place or at what point the amount was agreed upon. John testified that "there was a decision made [prior to January 4, 1971] to pay a bonus, but as far as a definite figure, I don't know." Petitioner's accountant did not recall being consulted in the decision to pay a $23,000 bonus and was not aware of the exact amount to be paid until preparation of petitioner's 1970 tax return in early 1971. There is no showing that the 1970 directors of petitioner, other than John and Clinton, were ever consulted as to the amount of the 1970 bonus. On January 4, 1971, the directors newly elected on that date authorized the bonuses. This conflicting evidence is not in our view sufficient to prove that the bonuses in issue were determined in amount and informally authorized prior to January 4, 1971. Bauer Bros Co. v. Commissioner, supra; Federal Machine & Welder Co., 11 T.C. 952 (1948), affirmed per curiam 184 F.2d 843 (C.A. 6, 1950). Accordingly, we uphold respondent's determination of the deficiency due for 1970. This leaves for our consideration the reasonableness of the $45,800 salary paid to each Clinton and John Tackman in 1969. The issue *203 is a factual one. Dahlem Foundation, Inc., 54 T.C. 1566, 1579 (1970) and cases there cited. Numerous factors have been considered by courts in determining not only whether payments to stockholder-officers were reasonable compensation for services rendered but also whether payments were purely for services rendered and not dividends in disguise. Charles McCandless Tile Service v. United States, 422 F.2d 1336 (Ct. Cls., 1970). Some of the factors to be considered are the employee's qualifications; the type and extent of the employee's services; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the general economic condition of the period; in close corporations particularly, the history of distributions to stockholders; rate of compensation for comparable positions in comparable enterprises; the salary policy of the taxpayer with regard to all employees; and the amount of compensation paid to an employee in previous years. The evidence shows that the services performed by Clinton and John Tackman were extensive, and responsible to a large extent for the continued financial success and growth *204 of petitioner's business, both prior to their purchase of petitioner's stock in 1968 and thereafter. Although neither man has formal education beyond high school, their own inherent abilities combined with hard work and dedication demonstrate that they are highly qualified personnel for petitioner's business. They performed all the various duties connected with petitioner's business, expanding the amount of construction, as well as its operating territory. Even though the business was competitive, they improved petitioner's gross sales sizably from $643,790.39 in 1967, prior to their assumption of management, to $884,285.10 in 1970. For these reasons, we consider them to be valuable employees of petitioner. However, we note that petitioner has never paid dividends to Clinton and John qua stockholders, and its salary and bonus payments correspond exactly to their 50-50 ratio of stock ownership. Moreover, petitioner raised Clinton's 1967 salary by approximately 58 percent and John's by 72 percent in 1968, the first year of their ownership, and by 102 percent and 120 percent, respectively, in 1969. Clinton and John did assume new and extensive responsibilities which required *205 additional effort and expertise. Although total officers' salaries paid in 1968 following the retirement of Tackman from the business were less than those paid in 1967, this was due, except for $182, to the elimination of the salary paid to Gene Main. John's and Clinton's salaries dramatically increased again in 1969, for no apparent reason other than to distribute an increased proportion of the corporation's earnings. Such an increase to $45,800 per year would clearly be less likely to occur if salary raises were subject to arm's-length bargaining. While gross income of petitioner rose by approximately 15 percent for 1968, 30 percent for 1969, and 38 percent for 1970, officers' salaries were increased at a much higher rate, nearly four times as fast as the proportional increases in gross income. In addition, compensation paid to officers in 1969 constituted 70 percent of petitioner's net profits (before salaries and income tax). Considering this, along with the fact that petitioner has never paid a dividend, it seems obvious that some portion of the compensation payments was in reality a distribution of corporate earnings. Charles McCandless Tile Service v. United States, supra, at 1339-1340. *206 In accordance with section 1.162-7(b) (3), Income Tax Regs., [4] and to support his determination that a salary of $30,000 in 1969 is reasonable, respondent introduced evidence at the trial of two allegedly comparable lumber businesses, one within several hours' drive of petitioner and another which is a competitor of petitioner. [5] We do not find the comparison of the first of these businesses helpful to our consideration here for several reasons and have made no findings with respect to its operation. In that company, extensive salaries were paid to a number of employees who, in the aggregate, performed the same duties carried out by Clinton and John Tackman alone. Also, the geographic area of its operation was not as extensive as petitioner's. Finally, the witness stockholder who testified estimated that services of managing a lumber company such as he and his brother owned and operated would be worth about $10 an hour and the salaries each of the stockholder-officers chose to take were only one-fifth of that amount. The witness explained that he and his brother as owners of the business wanted to leave the money in the business. *207 We do find the testimony and related information regarding the other business to be somewhat indicative of compensation paid for services similar to those rendered to petitioner by Clinton and John Tackman. Receipts of Clintonville Lumber Company consisted of 25 percent retail sales from its lumber yard, 25 percent from residential construction, 40 percent from farm building construction, and 10 percent from commercial construction. In 1969 Clintonville Lumber Company was wholly owned by its president and general manager who performed a variety of duties including selling, estimating, purchasing, bookkeeping, and general supervision of the business. He worked an average of 50 hours per week, without vacations, for which his annual salary was $29,500 for 1969 and 1970. At the same time, however, Clintonville Lumber Company employed more supervisory and other employees than petitioner in 1969, including full-time salesmen and a draftsman, and even had a separate manager who handled the farm building division and received a salary of $17,500 during 1969 and 1970. Both the $29,500 and $17,500 salaries included annual bonuses which were also paid to other nonshareholder employees *208 in 1969. We note that the president who received the $29,500 salary was the company's sole stockholder and presumably for that reason his salary was no more a bargained-for salary than were the salaries petitioner paid John and Clinton. This fact causes this evidence to be less persuasive as to a reasonable salary for services rendered than it otherwise might be. We also note that the president of Clintonville Lumber Company worked only 50 hours a week, whereas John and Clinton each worked over 60 hours a week. Considering all the evidence in this record and particularly the time and effort devoted by John and Clinton to petitioner's business and their expertise which led to increased success of petitioner, we find that $33,000 is reasonable compensation to be paid to each Clinton and John for services performed by them in the year 1969, and we allow petitioner a deduction for officers' salaries to that extent.
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩
3. Sec. 1.162-7 Compensation for personal services. (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. ↩
4. Sec. 1.162-7(b) (3). In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. * * * ↩
5. Although petitioner challenged the constitutionality of sec. 1.162-7(b) (3), Income Tax Regs.↩, in its petition, no argument was introduced at the trial in this regard, and no brief was filed. We therefore must assume that petitioner chose not to pursue this aspect of its case.